MINAGHAN, Plaintiff in error, vs. THE STATE, Defendant in error.

*October 2 — October 14, 1890.*

*Assault with intent to kill:* Charivari: *Evidence of custom.*

The plaintiff in error, who had just been married, fired into, and wounded one of, a *charivari* party which, for the third time, had assembled in front of his house and was serenading him with the firing of guns, blowing of horns, beating upon pans, etc. Upon his trial for an assault with intent to kill, witnesses for the state were allowed to testify that it was customary in that neighborhood to give a newly married couple a *charivari* unless there had been a public wedding to which all the people of the neighborhood were invited. *Held*, error.

ERROR to the Circuit Court for *Outagamie* County.

The following statement of the case was prepared by Mr. Justice CASSODAY:

The information charges the plaintiff in error with wilfully and feloniously assaulting and shooting John Higgins, with intent to kill and murder him, June 25, 1887. To that charge the accused pleaded " not guilty."

In charging the jury, the learned trial judge stated, in effect, that the testimony on the part of the state tended to establish that the defendant was a farmer, and had for

twenty years and upwards lived in the town of Chilton, Calumet county; that he was married about twenty years before, and by his first wife had several children, some of whom were quite young, and others partially grown up; that in 1885 his first wife died; that June 14, 1887, he married another woman, and took her to his home; that on Saturday evening, about 9 or 10 o'clock, June 18, 1887, a company of young men of the neighborhood, to the number of fifteen or more, went into the road beside the defendant's house, with guns, cow-bells, sap-pans, saws, and various other things; that they sent one of their number to the door of the defendant's house, and asked him for five or ten dollars to invest in beer or other refreshments; that the messenger went to the door, and informed the defendant, in substance, that the boys were in the road, and wanted five or ten dollars for refreshments, and would not give him a *charivari* if he advanced the money; that he refused to give them anything, and ordered them away; that the company then serenaded him for some time with gunshots, by blowing horns, beating on pans and fences, and perhaps with other noises; that on Wednesday evening, June 22, 1887, most of the party returned, and went through similar performances for some one or two or more hours; that on Saturday evening, June 25, 1887, about the same parties again assembled near the defendant's house, in the road, and for some time proceeded to fire guns, beat on pans, blow with horns, etc.; that after a season the defendant fired into the assembly of people there collected, at first with fine shot from a gun, and then in a moment after with ball from a gun or pistol; that some seven or eight of the people there assembled were wounded by the shot, and the complainant, John Higgins, with the ball fired; that the testimony on the part of the defense was substantially to the same effect, with the exception that it tended to prove that the conduct of those assembled was of a more aggra-

vated character in several respects than represented by the testimony on the part of the state; that such testimony tended to prove that on the first night $15 was demanded of the defendant by the company, with threats that, if he did not advance them that amount, they would come in the future and demand more money; that they called the defendant vile and indecent names; that they threw a heavy missile against his house on one or more of the evenings; that they used obscene language to him in the hearing of his family; that they fired guns so that it appeared as if a battle was going on; that they called out to each other to load with balls and shoot the defendant; that they pulled up his hitching post and broke his fence on one occasion; that on the second evening they cut an obscene figure on one of his gateposts; that, after his premises had been visited the second time by said parties, the defendant purchased powder and shot; that on the first and third evenings he went out near to the assembly to see if he could identify any of them, and could not do so; that the defendant's wife and small children, or child, were in great fear and terror, so much so that his wife has ever since had her nerves affected, and his youngest child was so alarmed that for some days or weeks she would wake up in the night, and scream with fright occasioned by those disturbances; that finally, on the last night they were there, the defendant went to a neighbor, and borrowed a double-barreled gun, having one barrel charged with powder and shot, and the other with powder and ball, as that barrel was for balls and did not carry shot without injury; that, when about 150 feet from the assembly, he fired the barrel charged with powder and shot in the direction of them; that they did not appear to mind that, and so, in a short time thereafter, he fired the barrel charged with powder and ball in the direction of the crowd, and on both occasions fired low, so that, if any one was hurt, serious injury would not be

inflicted; that he had no intention of killing any one, and he avers and says he only tried to scare them away, to protect his wife and child from the danger they were in and from the fear they were suffering; that there is no proof or claim that the defendant, at the time of discharging his gun, or at all on that last night, had ordered the said Higgins, or those with him, to go away from his premises, or to desist from making the noise which they were engaged in making.

At the close of the trial the jury returned a verdict of guilty of an assault merely. Upon that verdict the court entered judgment fining the defendant $10 and $371.20 costs. To review that judgment the defendant has sued out this writ of error.

For the plaintiff in error there was a brief by *Nash & Nash*, and oral argument by *L. J. Nash*. As to the inadmissibility of the evidence relating to an unlawful custom, they cited *Hawkins v. State*, 50 Am. Rep. 129; *Seagar v. Sligerland*, 2 Caines, 219; *Bankus v. State*, 4 Ind. 114; Lawson, Usages, 61, 62, 460, 461.

For the defendant in error there was a brief by the *Attorney General* and *L. K. Luse*, Assistant Attorney General, and the cause was argued orally by the *Attorney General* and *J. E. McMullen*.

CASSODAY, J. A civil action involving the same facts was before us at the last term. *Higgins v. Minaghan*, 76 Wis. 298. The accused owned the land on both sides of the road in front of and in the immediate vicinity of his house. The several persons who assembled in front of that house on the three occasions named had the legal right to use that road for travel, but for no other purpose, especially after being notified by the accused to leave the premises, as they confessedly were on the first night they appeared. The demonstration made in front of the house on each of the evenings

named, was confessedly an assault upon the accused and the several members of his family. The statute expressly declares, in effect, that any person who shall make any inexcusable or unjustifiable assault upon another, or who shall use, in reference to and in the presence of any member of his family, abusive or obscene language, intended or naturally tending to provoke an assault or any breach of the peace, shall be punished by imprisonment in the county jail, etc. Sec. 4398, S. & B. Ann. Stats. The statute also provides, in effect, that any three or more persons who shall assemble in a violent or tumultuous manner to do an unlawful act, or, being together, shall make any attempt or motion towards doing a *lawful* or an unlawful act, *in a violent, unlawful, or tumultuous manner*, to the terror or disturbance of others, shall be deemed an unlawful assembly; and, if they commit such acts in the manner and with the effect aforesaid, they shall be deemed guilty of a riot, and punished as prescribed. Sec. 4511, R. S. The statute also provides, in effect, that any person who shall, either *verbally* or by any written or printed communication, maliciously threaten to do any injury to the person or property of another, with intent thereby to extort money, or with intent to compel the person so threatened to do any act against his will, or omit to do any lawful act, shall be punished by imprisonment in the state prison, etc. Sec. 4380, S. & B. Ann. Stats. Such are some of the offenses which the assailants of the accused confessedly committed on the several nights of June 18, 22, and 25, 1887. Of course the perpetrators of those offenses were not on trial in this action; and we are not sitting in judgment on their conduct in the premises, except in so far as the same may be regarded as a provocation, excuse, or justification of the offense for which the accused was tried in the case at bar. These provisions of the statutes, in connection with the foregoing statement of facts, will serve to make more manifest some of the errors relied upon for a reversal.

---

Minaghan vs. The State.

---

The prosecution was allowed to prove, in effect, by the first witness sworn in the case, and against timely objections on the part of the accused, that it had been the custom in that part of the country, upon the marriage of any persons who failed to have a public wedding, and invite in all the people of the neighborhood, and treat them to beer, something to eat, and so on, to give them a *charivari*. This was followed by the testimony of at least two witnesses on the part of the state, taken under timely objections, to the effect that such custom existed in that part of the country. Such evidence was peculiarly calculated to influence the jury. Assuming that such custom furnished some excuse for assembling near the house of the accused in the first instance, which is very doubtful, yet it furnishes no excuse for remaining and conducting themselves in the way they did for hours after it is conceded they were ordered to leave the premises, nor for their returning on the two subsequent evenings. The accused had the legal right to get married in a private way, without treating or feasting any one; and, assuming that he did, yet it furnished no excuse for extorting money or assaulting the accused and his family in the manner conceded, much less in the manner testified to on the part of the accused. If it is not an established maxim, it ought to be, that no one can escape the punishment of the law by proving a custom contrary to law. It is for the good name of that community, and the honor of our commonwealth, that the laws prescribed by rightful authority shall be maintained in their integrity; and every true citizen should be interested in maintaining the same, any particular custom to the contrary notwithstanding.

There are other errors in the record, but, in view of what has been said, they are not likely to be repeated, and hence need not be here considered.

*By the Court.*— The judgment of the circuit court is reversed, and the cause is remanded for a new trial.