Stalcup *v.* The State.

---

STALCUP *v.* THE STATE.

[No. 17,865.   Filed November 24, 1896.]

CRIMINAL LAW.—*Appeal.*—Where in a criminal case the record clearly discloses that a fair and impartial trial has been had, the court will disregard errors which have not prejudiced the substantial rights of the defendant, but on the other hand, where it does not appear clearly from the evidence that the defendant was guilty, the court must scrutinize carefully the errors complained of to determine whether they are of such a character that defendant may have suffered from them.

Stalcup v. The State.

PRACTICE.— *Criminal Law.— Evidence.— Cross-Examination of Defendant.*—The defendant in a criminal case, who becomes a witness in his own behalf may be asked on cross-examination if a certain occurrence, not connected with the crime charged, did not take place ; but the State is bound by his answer, and cannot impeach him upon such collateral matter.

EVIDENCE.—*Criminal Law.— General Reputation of Defendant.*—The reputation of a defendant in a criminal prosecution, for peace and quiet, can be shown only by proof of his general reputation in that respect, and not by proof of particular acts.

SAME.—*Homicide.—Evidence.—Reputation of Deceased.*—The general reputation of the deceased for peace and quiet cannot be shown in a murder trial by testimony as to a particular instance of good conduct.

From the Marion Criminal Court. *Reversed.*

*Willard Robertson,* for appellant.

*W. A. Ketcham,* Attorney-General, and *F. E. Matson,* for State.

HOWARD, J.—The appellant was convicted of murder in the second degree and sentenced to imprisonment in the State's prison during life for the killing of George Owens.

It is assigned as error on this appeal that the court overruled appellant's motion for a new trial.

The quarrel which resulted in the death of George Owens occurred on May 13, 1895, in a drinking place, known as Power's barrel house, on East Washington street, in the city of Indianapolis. Both parties were colored persons. Excepting appellant himself, the only witness who testified to the circumstances leading up to and immediately following the fatal blow, was the barkeeper, John R. Merl. His testimony shows that at a little before 11 o'clock in the evening, Owens came into the place with a white man. It could be seen that both had been drinking. Owens stood with his back to the bar, not far from the screen, his left elbow resting on the bar. The appellant was then standing near the stove, about nine feet from Owens.

Owens did not say anything at first, but in a short time raised his head and looked over at the appellant, asking, in very gross language, why appellant was always bothering him. Appellant replied that he was not bothering him. With that both men seemed to move towards one another. Owens afterwards falling back to the bar, but a little farther down towards appellant. Appellant then also stopped, standing about two or three feet from Owens. Owens was at this time, as the witness says, standing "away from the bar and using the bar as a brace, leaning back." The witness continues: "While leaning back in that shape —he came in once before with a knife in his hand—I could see the blade of the knife in the palm of his hand, about that position (indicating), like that, and standing about like that (indicating). * * * Dave [appellant] had stopped walking, I think." At this time the deceased said: "Oh, damn you, and your family and your sisters." Appellant replied: "Don't you damn me and my sisters, don't you damn me and my family and sisters," calling him also a vile name. The barkeeper then saw that there was to be trouble and started around the screen to part them. His evidence continues: "When I got around there they had parted, just as I got around there. It looked like Mr. Owens braced himself that way and struck Dave that way, and in striking out fell over towards the barrels." "Did he miss Dave or hit him?" "Missed him." "That is the only strike you saw him make at Dave?" "I think it was, unless he struck the same time Dave did." The barkeeper then parted them, Dave, the appellant, going out on the street; and Owens also starting out, when apparently realizing that he had been hurt, he said, "I am cut." As appellant was going out the barkeeper had said to him, "Did you cut him, Dave?" but appellant made no answer.

Stalcup v. The State.

Appellant's own evidence as to the quarrel is that he was near the stove when Owens came in and stood leaning at the bar, and then continues: "He began to monkey with me, picking at me. I asked him to go away. I told him that he was full, and I did not care about fooling with him. He was drunk. After he found I would not fool with him, he got mad and cursed me, and he said: 'Damn you, you little black son of a b—h, I will cut your damned head off,' spoke that way. I did not know whether he meant it or not. I said to him: 'Maybe you will, you are big enough to do it.' Just that way. He said: 'Yes, damn you, I will do it.' I said, 'Well, I do not know;' so he gets back against the bar, and says to me: 'Damn you, and your mother and sisters, and the whole family of you.' I stepped out, I said: 'George, don't damn me and my family, my mother and sisters, they are not bothering you.' Just that way. He said: 'I will cut your damn head off.' He said that. When he said that I stepped back towards him from the stove, and said: 'Don't curse me and my mother and sisters.' They were not bothering him. He said: 'I will cut your damned head off.' He was leaning on the bar on his elbow, he had a knife in his hand, I saw the knife. I stepped back after he straightened up from the bar. I stepped back and he made two or three steps towards me with the knife in his hand. I saw he had the knife and I ran my hand in my pocket and pulled my knife out and opened it. He kept cursing me and coming towards me with the knife; he came three or four steps towards me. I saw he was going to cut me. He raised the knife and stepped back, and I got my knife open and he rushed on, and I stuck my knife at him, that way (indicating). He kept coming towards me. After I stuck my knife at him I did not know I had cut him

VOL. 146—18

until he rushed up by the door and stopped very sudden and fell down. When he got up his knife fell. He said, 'I am cut.' He gets back against the bar with the knife in his hand. By that time Johnny Merl [the bartender] came around from behind the screen." Certain statements made by appellant to the officers at and after his arrest were also given in evidence.

The two men were acquainted, but do not seem to have had any relations, either friendly or unfriendly, with each other, except that they had, during that day, a little scuffle. Appellant was a laborer and his reputation, previous to this, is not called in question. The deceased was much larger and stronger than appellant. He was abusive and quarrelsome when in drink, but otherwise apparently good natured. He had been sentenced to the workhouse for assault and battery. He had been in the barrel house twice before, during the evening of the fatal accident, once about half past six and once about nine o'clock. He was under the influence of liquor each time, and acted in an abusive manner.

Fred Baum testified that he saw Owens in the barroom about half past six. "He came in there," says this witness, "and commenced to raise a disturbance right away. * * * He stepped up to the bar and asked for a drink, and the barkeeper refused him, would not give it to him, and the bartender told him to get out; and he did not do it right away, and the bartender called to Mr. Davis, and Mr. Davis came down the back way, and he turned around and dropped his knife. * * * I saw it, he picked it up and went out, and he was about half way in the barroom, and turned around his head and said, 'I will go and kill that Dutch son of a b—h,' " referring to the bartender.

Appellant testified that he witnessed the quarrel

with the bartender, and saw Owens drop his knife as he went out, and pick it up again. The bartender, Merl, also testified that on the second occasion when Owens came in, appellant was shaking dice at the bar, when he, Merl, said: "That fellow [meaning Owens] acts as though he was looking for trouble." Appellant testified further that he had heard that Owens was a dangerous man when drinking, and had also heard that Owens had been in the workhouse for assault and battery.

The testimony in the record discloses a case that makes it necessary to scrutinize carefully the errors of which appellant complains to determine whether they are of such a character that appellant may have suffered from them. In cases where it is manifest that a fair and impartial trial has been had, and that the judgment is just on the merits, the court, as required also by the statute, will disregard errors which have not prejudiced the substantial rights of the defendant, and will suffer the judgment to stand. Section 1964, Burns' R. S. 1894 (1891, R. S. 1881). This, however, is not such a case. See *Hutchins* v. *State*, 140 Ind. 78, 16 Crim. Law Mag. and Rep. 435.

Spencer Brown, a witness called by the State in rebuttal, was asked whether, "on a certain evening in the spring of the year, while David Stalcup was behind the soup counter in Powers' barrel house of this city, if some one did not call David Stalcup a son of a b—h, and he tried to get over or around the counter at him, and you and others interfered?" The appellant, on his cross-examination, had been asked the same question by the State, and had denied that any such occurrence had taken place. It was, perhaps, proper to have asked the question of appellant, on his cross-examination. He had presented himself as a witness in his own behalf, and, subject to the discre-

tion of the court, might undoubtedly be subject to the same tests applied to the testimony of other witnesses. *Parker* v. *State*, 136 Ind. 284. This, however, was the limit to which such collateral inquiry could go. The State was bound by the negative answer of the appellant, and could not seek to impeach him in a matter not relating to the charges made against him in the trial and against which he was then defending himself. Neither was the question put to the witness Brown proper as tending to show the reputation of appellant for peace and quiet. This could be shown only by proof of appellant's general reputation, not by proof of particular acts. *Drew* v. *State*, 124 Ind. 9; *Grffith* v. *State*, 140 Ind. 163.

Counsel for State practically admit that this was error, but endeavor to show that the error was harmless. We are of opinion that, considering the state of the evidence before the jury, we cannot say that the error was harmless. There were but two witnesses to the fatal quarrel. Indeed, there was but one witness to the actual encounter, appellant himself. The error complained of allowed the jury to conclude that in an immaterial matter, one not directly concerning the charge against him, the appellant had testified falsely; and they might well, therefore, form the opinion that in an account given by him of the encounter with Owens, in which his liberty, if not his life, was involved, he would be still less likely to speak the truth. And if the jury put no credence in the story told on the trial by appellant, it may well be that they gave little heed to his plea of self-defense, or might find malice where none existed, and so find him guilty of murder in the second degree, instead of manslaughter.

A like error was committed in permitting the State to ask one of its witnesses, Aaron King, as to a certain

- praiseworthy action of the deceased. The general reputation of the deceased for peace and quiet could not thus be shown by testimony as to a particular instance of good conduct. This, too, under the circumstances, we are not able to say was harmless error; for if the jury were thus impressed with the belief that the deceased was of a gentle disposition, they might look upon the act of appellant, in taking his life, as the more inexcusable.

Complaint is also made of the giving, and also of the refusal to give certain instructions. It would seem that this was a case in which the court should, perhaps, have more carefully charged the jury as to the element of malice and the distinction between murder and manslaughter. No good purpose, however, would be served by further considering alleged errors which may not be repeated on the next trial, even if they occurred on this, as claimed by counsel.

The judgment is reversed, with instructions to grant a new trial.