STATE, RESPONDENT, *v.* SHADWELL, APPELLANT.

[No. 1,356.]

[Submitted May 2, 1899.  Decided May 26, 1899.]

| | |
|---|---|
| 22 | 559 |
| s26 | 53 |
| s26 | 58 |
| s26 | 60 |
| 22 | 559 |
| 138 | 570 |
| 38 | 572 |

*Criminal Law—Bill of Exceptions—Evidence—Homicide—Character of Accused—Previous Threats—Instructions—Witnesses—Credibility—Appeal—Reversible Error—Defects in Information—Waiver.*

1.  Under Section 2194 of the Penal Code, no independent specification of errors is required other than a bill of exceptions, yet, if the defendant does incorporate in his proposed bill of exceptions on motion for a new trial a specific enumeration of errors in law alleged to have been made by the court during the course of the trial, with a statement that "defendant duly excepted at the time," and the judge settles, allows and signs as correct the bill of exceptions containing said enumeration of errors and statement; such action of the judge makes the said enumeration of errors and statement a part of the bill of exceptions in the case, and thereby imparts a verity to such statements which cannot be impugned by counsel for the State in oral argument on the hearing of the appeal, particularly where counsel for defendant announces that he stands upon the record, and counsel for the State had had full opportunity, before the bill was settled, to correct the record so as to make it conform to the facts.

*Obiter.*—The judge of the trial court should not allow a bill of exceptions, misstating the facts, to come to the Supreme Court.

2.  On an appeal by a defendant convicted of murder in the first degree, a manifest clerical misprision in the bill of exceptions will be ignored.

3.  Where, on a trial for murder, it is shown that at the moment accused killed deceased the latter had him against the wall of a saloon, and was pushing a table against him, evidence of previous threats of violence made towards accused by deceased is admissible to enable the jury to ascertain whether accused was prompted by malice or believed he was in danger of great bodily harm. .

4.  On a trial for murder, evidence as to deceased's conduct towards others in the presence of accused just prior to the killing is admissible.

5.  Evidence, on a trial for murder, that it was a custom of accused, when gambling, to leave the table and go out, to rebut the theory of the prosecution that the accused left to procure a pistol, is properly excluded, where accused had explained his purpose in going out.

6.  On a trial for murder, a witness' personal observations of specific acts of violence towards third persons are inadmissible to prove the general reputation of deceased for quarrelsomeness.

7.  On a trial for murder, it is not reversible error that the court divided its instructions into two sections, and read them separately, unless they were conflicting, though the better practice is to read all the instructions on one branch of the case consecutively.

8.  An instruction, on a trial for murder, that if the act of killing was preceded by a concurrence of will, deliberation and premeditation of the slayer, it was murder in the first degree, no matter how rapidly such acts of the mind may have succeeded each other, or how quickly they were followed by the act of killing, is misleading, in affording the jury an opportunity to accept it as a complete definition of murder.

9.  On a trial for murder, it is permissible, on cross-examination, to ask a witness to whom he paid rent, to identify him and test his credibility.

10.  Defects in the information are waived if the objections are not urged at the proper time.

*Appeal from District Court, Silver Bow County; William Clancy, Judge.*

G. R. SHADWELL was convicted of murder, and appeals from the judgment and an order denying his motion for a new trial. Reversed.

*B. S. Thresher* and *Hamilton & Thresher*, for Appellant.

*C. B. Nolan, Attorney General,* and *C. P. Connolly,* for the State.

HUNT, J.—Robert Shadwell, by appeal to this Court from a judgment and order denying his motion for a new trial, seeks to obtain a review of a sentence of death for the murder of Martin J. O'Connor in Butte on January 11, 1898.

1. From the 20 errors urged by his counsel we have selected, as entitled to first consideration, the striking out of certain testimony introduced by the defendant, as shown by the following extracts from the bill of exceptions: "That after the evidence had all been introduced in said cause, and both the plaintiff and defendant announced that they had no more evidence to offer, said cause was by counsel for the State and for the defendant argued to the jury. That during the argument of the county attorney to the jury, and at a point in his argument where he referred to the evidence of the witness Bugliss and the evidence of the defendant relative to the transaction which took place at the game of cards on or about the evening of the 9th of January, 1898, wherein some trouble arose between the defendant and the deceased, O'Connor, relative to the cutting of the cards preparatory to a deal, the county attorney was interrupted by the court, and was told by the court to not refer to any part of the evidence relative to the alleged trouble between the defendant and the deceased on or about the 9th of January, 1898; that all of said evidence was irrelevant, and had by the court been stricken out; that no evidence should be considered by the jury of any game of cards between the defendant and the deceased, or any trouble

between the deceased and the defendant prior to the game of
cards in which or at which the defendant fired the shot that
resulted in the death of the deceased, O'Connor.    The court
further stated orally to the jury:    'And, gentlemen of the
jury, you are instructed that all such evidence, if there has
been any, has been stricken out, and you are now instructed
to disregard any evidence of any of the witnesses relative to
any prior transaction or occurrence between the defendant and
the deceased, O'Connor.    And you are further instructed to
pay no attention to any remarks or comments of counsel upon
such evidence.' "

Further on in the record we find the following: "And now,
upon this 18th day of July, 1898, comes the defendant, and
serves and files his proposed bill of exceptions on motion for
a new trial, and asks that the same be signed, settled and al-
lowed as true and correct, and as containing all the evidence
introduced upon the trial of said cause, and all the proceedings
had in said cause before this court; and said defendant in such
proposed bill of exceptions makes the following assignment of
errors in rulings by the court during the progress of such trial,
to which rulings of the court the defendant duly excepted at
the time."

An "assignment of errors" then follows, in which are enu-
merated various objections to the court's rulings upon testi-
mony, as shown throughout that portion of the bill of excep-
tions containing the evidence produced on the trial. Included,
also, in this "assignment" is a specification, numbered 20,
setting forth that it was error for the court "to state, during
the argument of the county attorney to the jury, that all of
the evidence of the witness Buglis and the defendant relative
to the trouble which took place between the deceased, O'Con-
nor, and the defendant, on or about the night of June 9, 1898,
was irrelevant and immaterial, and that the same had been by
the court stricken out, and to instruct the jury orally that
such evidence had been stricken out, and that they should not
consider the same, or the argument of counsel relative to such
evidence."

Counsel for the State argue that defendant cannot avail himself of this error because the record fails to disclose that any objection was made to the action of the court in withdrawing the evidence referred to in the judge's statement to the jury, or that an exception was taken to the action of the court *at the time* the evidence was so stricken out. But, notwithstanding the silence of that part of the record which states the ruling of the court in withdrawing the testimony, it does elsewhere appear, by the record as above set forth, that, after notice of intention to move for a new trial was served, defendant filed and served his "proposed bill of exceptions on motion for a new trial," purporting to contain, among other things, "all the proceedings had in said cause before the court," in which proposed bill of exceptions the defendant made the particular assignment of error numbered 20, *supra*, predicated upon the particular ruling of the court referred to in said assignment No. 20, and stating that to the ruling of the court "the defendant duly excepted at the time." This proposed bill of exceptions, together with certain amendments proposed by the State, was submitted to the judge for settlement on October 8, 1898, and on November 18th thereafter, "in the presence of and by the consent of counsel for both the plaintiff and the defendant," as a bill of exceptions it was "settled, allowed and signed as true and correct" by Judge Clancy, the judge who tried the cause. Under this condition of the record we are constrained to hold that the judge, in settling and allowing the bill of exceptions as proposed, and in certifying to its correctness, certified that to his ruling in withdrawing from the consideration of the jury the evidence specified in assignment No. 20, defendant "duly excepted at the time." Wherefore it becomes our duty to consider the ruling, and its effect upon the substantial rights of the accused.

While no independent specification of errors is required, under the Penal Code (Section 2194), other than a bill of exceptions, yet, if the defendant does incorporate in his proposed bill a specific enumeration of errors alleged to have been made by the court below in decisions upon questions of law arising

in the course of the trial of the case, so far as the allegations go, the office of such enumeration is merely to inform the State of the points intended to be relied on by defendant more fully than it has been notified by the original general designation contained in the notice of intention to move for a new trial; and where the judge settles and allows as correct the bill of exceptions containing such enumerated errors, and certifies that to a ruling withdrawing certain evidence, specified as error in the enumerations, the defendant duly excepted at the time, we must hold that the exception is preserved.

In *Territory* v. *McClin*, 1 Mont. 394, on appeal from the judgment and bill of exceptions, the Court said: "It is contended by respondent that the record does not disclose the fact that any proper exceptions were taken at the trial to the rulings of the court upon the introduction of evidence, or to the charge of the court to the jury. This is an appeal from the judgment roll, and the bill of exceptions is properly before the court for consideration. The bill of exceptions commenses as follows: 'Now comes the defendant, by his attorneys, and tenders the following bill of exceptions, which were taken at the proper time and allowed.' We think these words form a part of the bill of exceptions, and, the bill being signed by the judge as correct, we must hold that to any ruling of the court, objected to at the time as disclosed by the bill of exceptions, proper exceptions were taken at the time and allowed. This is the plain import and meaning of the language employed."

Holding, then, as we must, that the action of the judge made the proposed bill of exceptions and its enumeration of errors the bill of exceptions in the case, it follows that verity is imported by the bill, and that defendant was allowed his exception to the point involved. (*State* v. *O'Brien*, 18 Mont. 1, 43 Pac. 1091, and 44 Pac. 399.) It also follows that we cannot ignore the record by acting upon the statement of counsel for the State, made during the oral argument, to the effect that defendant's counsel seeks to take advantage of a ruling not objected to on the trial, particularly where counsel

for defendant announced that he stands upon the record, and upon its conclusive disclosure that an exception was duly taken to the ruling complained of at the time of the court's action. Furthermore, if, as a fact, there was no exception "duly taken at the time," full opportunity to correct the record, so as to make it conformable to the facts, was given after the proposed bill of exceptions was served upon the county attorney, and during the time wherein he could propose amendments thereto, and before the bill was settled. Again, if the bill of exceptions misstated the facts, the judge of the District Court should not have allowed it to come to us in the condition it has. More than once has it been laid down that this Court is obliged to examine and consider the bill of exceptions as it has been transmitted from the District Court, and to credit it with being correct. (*State* v. *O'Brien*, *supra*, and cases therein cited.) We believe, therefore, that it is our duty to pass upon the point of the exception.

In connection with the taking of this exception, our attention is called to the fact that the specified error quoted above pertains to the exclusion of evidence respecting an occurrence of *June* 9, 1898, whereas the ruling excluded the evidence of an occurrence of *January* 9, 1898. But, as it is conceded that there was no evidence at all relating to any occurrence had on *June* 9th, while there was evidence respecting one which happened on *January* 9th, manifestly the writing of "*June*" for "*January*" was a simple clerical misprision, on account of which it would be a fearful injustice for the court to deny to the prisoner, whose life is involved, a hearing on the merits of his exception, otherwise before us.

We therefore pass to the evidence, in order to demonstrate the materiality of the exception and the legal effect of the court's ruling.

2. On behalf of the State a witness named Clancy testified as follows: On the morning of January 11, 1898, defendant Shadwell was in Kelly & Eagan's saloon in Butte. Between 5 and 6 o'clock the defendant was playing cards with one Johnson and one Steinborn. The deceased, O'Connor, was

sitting at the table opposite to Shadwell, apparently keeping account of the games played between the persons mentioned. O'Connor conducted the card-playing part of the saloon business of Kelly & Eagan's saloon.   While the game was going on O'Connor, who had been drinking quite heavily that night, said to Shadwell:  "If I catch you cheating again, I will give you a chair over the head."   Shadwell was dealing at the time, and O'Connor continued, telling him that he had spoken to him before like a gentleman, and that, if he did not deal "straight," he would have to leave the game.   Shadwell said nothing, but left the table, leaving some chips in front of him, and passing out of the saloon into the street.   On coming back, very shortly before 6 o'clock, he resumed his seat at the card table, and called for some chips, whereupon O'Connor told him he could not play any more.   Shadwell replied:   "If I don't play, nobody else will."   O'Connor said nothing, and Shadwell again called for his chips.   Johnson had the cards at the time that Shadwell made the remark just quoted, but Shadwell grabbed for them, to take them out of Johnson's hands.   About then O'Connor said he wanted to close the game, and stood up and reached for the cards. Shadwell, who appears to have had the cards by this time, also jumped up, and pulled a pistol from inside of his vest. He held the "gun" with both hands, and pointed it at O'Connor.   O'Connor then tipped up the table, which was about three feet in diameter, and stooped over.   He stood with the table raised with one hand, and was "kind of reaching over at the same time, as if trying to grab the gun."   He had nothing in his hand except the table.   He raised one side of the table only, tipping it in front of him.   Johnson moved away from O'Connor, whereupon Shadwell fired, hitting O'Connor in the head.   Three men then grabbed Shadwell, who struggled to get away.   O'Connor fell on his face and died immediately.

A witness for the prosecution, named McAuley, stated that O'Connor called Shadwell "some vile name, and told him he would take a chair to him," before Shadwell left the saloon,

and that O'Connor kept dodging behind Johnson after Shadwell had drawn his pistol. This same witness said that, at the time of the shooting, O'Connor was right close up to the legs of the table, and that Shadwell was also right up to the table, backed up against the wall, but that O'Connor "kind of backed up from the table before the shot was fired, and fell right on his face, right up in the corner." "I could not tell," continued the witness, "whether O'Connor was trying to protect himself, or get at Shadwell, or not; it was hard to tell. He was crowding him all the time. O'Connor was between the legs of the table." Witness also stated that at the time of the shooting they were about two feet apart. It appears that O'Connor had no weapon at the time of the occurrence.

Another witness for the state, named Anderson, stated on his cross-examination that, when Shadwell returned to the saloon, he ordered the barkeeper to bring his chips over, whereupon O'Connor told the barkeeper "to bring him nothing." Shadwell then said: "If I can't play, nobody else can play." Thereupon witness continued, Shadwell "gets the cards from Johnson, and O'Connor raises up to get the cards away from him, and I seen Shadwell raise up, and Johnson raise up. O'Connor raised up first. The remark that he made, when he raised up,—he says, 'You s—— of a b——, go ahead and make your bluff.' O'Connor at the time kind of reached out with his right hand toward Shadwell. Shadwell raises up, and Johnson raises up, and the next I seen the table up, and a hand over the table. It was O'Connor that held up the table. It looked as though he was pushing it over towards Shadwell. He was leaning against it. Shadwell stood up against the wall, and the table was going on over towards him. O'Connor had a hold of the table with his left hand. With his right he reaches out kind of quick with it, and tried to take the gun, or to hit Shadwell, I don't know which, I do not know whether he went to get the gun, or whether he went to strike at him. * * * He had been abusing Shadwell all night. He was in that kind of a mood generally that night."

Charles McGowan testified, in behalf of the State, that, just before Shadwell left the card table, he heard O'Connor tell him to deal the cards from top to bottom, saying, "if you don't, I will put you where they don't play cards," and that Shadwell then got up and walked out.

In behalf of defendant a witness named Barrett testified that, just before Shadwell left the saloon, O'Connor took the cards away from him, saying, "You dirty little s—— of a b——, I told Charley and several other of the boys about that business, and, if you don't quit that, I will hit you over the head with a chair, and you prepare yourself for it." Shadwell then left. When he returned, his manner was as usual, and he warmed himself by the stove, and immediately thereafter walked to the card table, and sat down where he had been before. This witness said that O'Connor was very abusive towards Shadwell that night, and that he never heard a man abuse customers as O'Connor did.

Frank Buglis, called by defendant, said he saw Shadwell and O'Connor in the saloon mentioned on the 8th or 9th of January; that is, two or three days before the homicide. He said that O'Connor, Shadwell and another man were then playing a game of poker, and that Shadwell asked for the cards to cut them, to which the third person objected. Shadwell then said he had a right to cut the cards, whereupon the third person playing grabbed Shadwell's hands, telling him to cut the cards right, and, just as he said this, O'Connor got up, saying, "Look here, you little s—— of a b——, I want you to cut them cards and cut them right; I am not afraid of you, if you are a gun fighter," to which Shadwell replied that O'Connor could call anybody in the house to cut the cards, whereupon some one cut them, and the game went on. Witness said that upon that occasion O'Connor had been drinking, and that nothing previously had occurred to call forth the expressions used by O'Connor.

Another witness for the defense, by the name of Antonio, said that O'Connor told Shadwell, just before the killing, to shuffle the cards from the bottom, or he would turn the table

on top of him.   He described Shadwell as sitting at that time
against the wall, and O'Connor as being on the opposite side,
sitting down.   This witness said that, when Shadwell came
back and took his cards, he said, "Where is my checks?" and
O'Connor said, "Your checks are put away; I won't give you
any checks." Whereupon Shadwell said, "Fetch them back,"
and that O'Connor finally reached for the cards, which Shad-
well had at the time.   He described O'Connor's disposition as
"rough" when he reached for the cards, and said that
O'Connor called Shadwell "a bastard" and a "s—— of a
b——," or "something like that."

Defendant himself testified that he had known the deceased
for about a year; that deceased was a man about 5 feet 10 or
11 inches, very heavy set, and weighed probably 190 pounds;
that he had been in the saloon on the 8th or 9th of January,
playing poker with O'Connor and a man called "Slim" and
some one else; that during the course of that game he (Shad-
well) claimed the right to cut the cards, whereupon O'Connor
jumped up, and put his checks in his pocket, and walked
around, saying: "You little s— of a b——, if everything
ain't on the square, I will kill you." Defendant says he did
nothing at that time.   He testified that upon the night of the
homicide he had been in the saloon gambling until 12 or 1
o'clock, then went away to the theater, and returned about 4
o'clock, and found O'Connor and two other men playing.   He
sat down in the far chair in the corner, and called for some
chips, and joined in the game.   He stated that O'Connor had
been drinking that morning, and was very abusive when he
was drinking, "and any one he thought was small, or was a
'mark,' he would pick them up and abuse them, and pull their
noses, and so on." Witness said that O'Connor was drinking
most of the time while he was playing, and seemed to be los-
ing, and was angry when he lost, and that he (defendant) had
the largest pile of chips; that deceased had hit a miner in the
stomach that morning while talking about two dollars which
the miner seemed to be inquiring about.   O'Connor's manner,
defendant said, was very "sore" at him (defendant), thinking it

was because O'Connor did not like to see him win. Defendant's account of the killing was as follows: "As I started to shuffle the cards, he jumped up, and said, 'You damned little s— of a b——, shuffle them cards right, or I will hit you over the head with a chair,' and he grabbed the cards out of my hand, and then I didn't say anything. He set the cards back to me, and I shuffled them up, and this Fred cut them, and I dealt the cards around, and I don't believe that I had more than my ante in the pot, * * * and Mr. Johnson took the cards. After O'Connor handed me the card deck, I went ahead and shuffled and made the deal. Then Mr. Johnson took the cards, and shuffled them up, and I cut them, and then I happened to think that I had a key in my pocket that I was supposed to give to my brother, so he could go down home and sleep, and I just left my checks and overcoat." Witness then related how he looked for his brother, and found him, gave him the key, and returned to the saloon in about thirty minutes. "I walked on into the gambling room, and walked around the south way, and took my seat where I had left it; and I says to Henry Hackman, who was supposed to be Red's (O'Connor's) partner,—I said, 'Bring my checks,' which he had often done before. O'Connor spoke up then, and said, 'You can't play any more.' I says, 'I have as good a right to play as anybody.' I think the cards were lying on the table by Mr. Johnson, and, reaching for them, I took the cards up, and began shuffling them, and O'Connor reached over the table and grabbed my hand, that way (indicating), and whether he was grabbing at me, or grabbing at the cards, I don't know. He got the cards. I believe he got the cards. I was, of course, in a sitting position, and I kind of raised up a little, too; and, as I raised up, just about that position (indicating), he starts to go around the table that way (indicating); and, as he does, the table knocks up against me, and I seen it coming. I drawed my gun; that gun there (indicating). I have got my pants with no pockets in them, * * * and I always carry my gun with my vest closed that way (indicating). * * * I drew the gun when I was in this half-sitting position,

and Mr. O'Connor was reaching around the table towards me.
I was in there just about that position (indicating), and I un-
buttoned my vest that way (indicating), and reached for the
gun. The reason I reached for the gun was because I was
scared of O'Connor. He was a large man, and I was afraid
for him to get hold of me. This man Johnson that I spoke of
was in front of O'Connor and myself. He was in front of
O'Connor. At that time O'Connor started to rush around the
table, when I drew the gun. *  *  * I was sitting right
here (indicating), kind of up in the corner,—up against the
wall. Johson was sitting to my left. *  *  * O'Connor
was sitting over there, close to the door. After O'Connor
jerked the cards out of my hand, he came around Johnson,—
came around this way from Johnson (indicating). He came
clear around, right up close to me, and, of course, Johnson
made kind of a stop there, and then is when I got the gun;
and I guess, when O'Connor saw he couldn't get at me, John-
son walked on out, and then O'Connor starts to grab the table,
and starts to push the table at me with one hand and strike at
me with the other. O'Connor takes the table with this hand
(indicating), and raises it up that way, and starts shoving it
over onto me. When he starts to raise the table up this way
(indicating), it caught me here (indicating), as it was so close
to me. The rim of the table caught me there, and when the
shot was fired I was just about in that position (indicating),
and O'Connor right on me, and the table braced against me
like that (indicating) My chair was right up against the wall.
I fired the shot because I was afraid of O'Connor. He threat-
ened me several times. I was afraid of him to get a hold of
me; afraid he would cut my ear off, as he had threatened to
do. He was striking at me; trying to get at me as fast as he
could; coming right at me. After that I think the table tipped
over on the floor. *  *  * After I saw O'Connor stagger
and kind of fall, I didn't know whether he was wounded or
not. I was satisfied he couldn't get at me, and I dropped the
gun, and walked towards the door." Defendant then de-
scribed his arrest, and said that he had had the pistol with

which he had killed O'Connor for many years.   On cross-examination he said he was 26 years old; that he had been a gambler for a long time; that he always carried a pistol with him, when he was up late at night, and had money; that, when O'Connor threatened to break a chair over his head, he also told him to prepare himself, and he would "fix me so I wouldn't play any more cards."   He said that O'Connor was trying to get hold of him any way he could, and wanted to put the table on top of him; that he was a small man, weighing 110 pounds; and that the reason he started to raise up before the shot was fired was because O'Connor was coming around the table after him.   The cross-examination, in relation to the position of defendant and the deceased and the use of the table, was rigid.   Defendant adhered to his statements that O'Connor was pushing the table on him, and coming after him at the time he fired the shot.

Defendant's brother testified that, at about half past 5 o'clock on the morning of the homicide, the defendant met him in a saloon, and gave him a key to the house where defendant's mother lived.   His mother also testified that she told defendant, on the night of the 10th, to take his brother's key up and give it to him.

The foregoing resume of the testimony is sufficient to illustrate the events occurring at the homicide itself and just prior thereto.   It also suffices to show that upon the trial evidence was admitted which extended back to a game of cards of the night of the 8th or 9th of January, two nights before the homicide, when the witness Buglis said he heard O'Connor without cause apply the epithets quoted to the defendant, telling him that he was not afraid of him if he was a "gun fighter," and when, according to Shadwell's evidence, O'Connor also said to him, with an epithet, "If everything ain't on the square, I will kill you."   This evidence was competent, and was evidently considered so by the counsel for the State on the trial, for it was admitted without objection, and was before the jury when the argument began.   The jury had a right to consider it, and ought to have done so in weighing the evi-

dence before agreeing upon a verdict. If the testimony given in respect to the threat of the 8th or 9th, and to the remarks which Buglis said were made in his presence by deceased to defendant, was credible, it had to do with defendant's motive in killing O'Connor; hence was of the utmost importance, and became a proper subject of investigation. Now, in probing that motive, to ascertain whether he was prompted by malice, and acted maliciously, or whether he believed he was in danger of great bodily harm at the hands of the deceased during the movements of the two at the card table, just before and at the time of the killing, it was competent to prove previous threats of violence made towards defendant by O'Connor, as tending to show a cause for the belief Shadwell says he entertained that he was in great danger of receiving harm from O'Connor at the time that he fired at him and killed him. (Kerr on Homicide, p. 426.)

Without the existence of malice aforethought there could not have been murder; but, as said, to get at the fact of the presence or absence of such malice, recent previous difficulties with the deceased and recent prior threats by the deceased against the accused in this case, known to him, were admissible, and became a proper subject for argument by both sides. Many authorities recognize a qualification to the rule just stated, to the effect that "where it is clearly and unequivocally shown that the defendant was the aggressor, and there is no pretense that the deceased was about to carry the threats into execution, or that the defendant had reasonable grounds to believe, and did believe, that such was the case, evidence of such threats by the deceased, although they were communicated to the defendant, is inadmissible." (*Id.* p. 428.) But the qualification is foreign to the consideration of the case presented, because in the record there is testimony on behalf of the State, as well as on behalf of the defendant, tending to show that deceased, O'Connor, had Shadwell backed up against the wall of the saloon, and was pushing a table against him, before and at the moment the defendant shot and killed him. With the truth or falsity of this evidence that defendant was

against the wall the court had nothing to do,—that was for the jury to consider. But, being relevant and competent, it put the defendant's case in a position where the evidence of the prior threats and difficulties became admissible, and, it seems to us, of vital importance to defendant before the jury.

So we are unable to understand exactly what the theory of the court was in admitting the accounts of the threats and innuendoes, and thereafter, of its own motion, withdrawing the evidence of them from the jury, with a positive direction that the jury should disregard all evidence of them, and pay no attention to the remarks of counsel upon such evidence. We cannot escape the conclusion that the court erred, and that the error was prejudicial to the defendant's substantial rights. It is, therefore, ordered that the judgment be set aside, and a new trial awarded defendant.

3. Henry Hackman, a witness for the State, who was present at the killing, and who had been in the saloon off and on all night, was asked on cross-examination if he knew how deceased had been acting the night of the homicide, and what his manner was towards his customers. The county attorney objected, upon the ground that "it was immaterial except as to defendant." The objection was sustained. We cannot approve of the substance of the ruling. The witness saw defendant in the saloon frequently that night. He said that deceased had been drinking heavily before he was killed. Witness had evidently observed the conduct and demeanor of the deceased for hours just before the killing. Now, suppose his conduct was boisterous; that his rage towards others was desperate, or his temper was ferocious, and vented itself in fighting, abusing and terrifying others who came into the saloon just before the homicide; and that defendant observed this manner towards others. Would it not be relevant to the question of the reason for defendant's belief, if he had one, that the attack he says O'Connor made upon him when he killed him was to do him great bodily harm? We think it would, and that, therefore, what transpired in defendant's presence on the night of the killing was proper, even though it involved

the conduct of the deceased towards others. On the other hand, we find no error in permitting evidence to be introduced of the defendant's manner towards the deceased, or others in the presence of the deceased, just before the homicide.

4. The court refused to allow a witness for the defendant to testify that it was a custom of defendant, when he was gambling, to get up and leave the card table, and go out of the place where the game was being conducted. This evidence was evidently offered to rebut the theory of the State that, when defendant left the table after O'Connor had insulted him, his purpose was to get the pistol with which he afterwards killed deceased. We find no error in the exclusion of this evidence, in view of the fact that the defendant himself said that he suddenly remembered that he had his brother's night key, and that his purpose in going out was to give the key to his brother, whom he found in a saloon. If this was true, he did not yield to any general habit of his, and the evidence of one became immaterial.

5. Defendant asked a witness named Albright, who testified that he had known deceased for six or seven years, the following question: "Had you, from your acquaintance with him, had an opportunity to observe, and had you observed, during this acquaintance, and the morning of the 11th, when you saw him, what his general disposition was as to aggressiveness, combativeness and quarrelsomeness?" The court sustained an objection to the question. Counsel says this question was intended to ascertain the fact whether the witness could say "what the general disposition of the deceased was as to aggressiveness, combativeness and quarrelsomeness." If it was, it should have been confined to mere general reputation of the deceased, apart from any particular opinion the witness entertained, based upon his observation of specific acts on the night of the homicide. As we have already pointed out, the acts of the defendant, his manner and conduct in the saloon in the presence of the deceased on the night of the killing, were admissible. So was his general reputation for violence. But the two involved separate inquiries, governed by different

rules.    To prove the  general  reputation of  the deceased for
vindictiveness or quarrelsomeness, evidence of  specific acts of
violence  towards  third  persons was not  inadmissible;  hence
the personal observation of the witness was incompetent upon
this branch of the question.     (Underhill on Cr.  Ev.  Sec.  325;
*People* v.  *Druse*, 103 N.  Y.  655, 8 N.  E.  733;  *People* v. *Gor-
dan*, 103 Cal.  568; 37 Pac.  534;  *Tiffany* v. *Com.*, 121 Pa. St.
165, 15 Atl.  462;  *Powell*  v.  *State*, 101 Ga.  9, 29 S.  E.  309;
*Stalcup* v.  *State*, 146  Ind.  270,  45  N.  E.  334;  *Garner* v.
*State*, 28 Fla.  113, 9  South.  835;  *Sawyer* v.  *People*, 1 N.  Y.
Cr.  R.   249.)   Defendant's  counsel  should  have  limited his
question to obtain the evidence he says he intended to adduce.

6.    Defendant  complains  because the  court  ''divided the
instructions  given  to  the  jury into two sections or divisions,
and read the same to the jury separately.''    It simplifies the
procedure for the court  to read all the instructions given  on
one branch of the  case consecutively, whether they have been
offered by the prosecution or defense, but the omission to pur-
sue  this  course  is  not a reversible error, unless the instruc-
tions are conflicting or erroneous.

7.   The court, by a separate instruction, said to  the jury
as follows:    ''If the act of killing be preceded by a concur-
rence of  will, deliberation and premeditation on the part of
the slayer, it is murder in  the first  degree, no matter how
rapidly these acts of the mind may succeed each other, or how
quickly they may be  followed by the act of killing.''   De-
fendant says that this is an erroneous definition of  murder in
any degree, and cites the case of  *State* v.  *Shafer*,  22 Mont.
17, 55 Pac.  528, to uphold his argument.    If the instruction
stood alone, of  course, it would be fatal in its omission of  the
fundamental  ingredients of  the  crime of  murder in  the first
or second degree.    But the statutory definitions of  both de-
grees of murder were elsewhere explicitly given in the charge
and perhaps the error was not prejudicial.    We need not say
whether it was or not.    But we must earnestly disapprove of
the instruction as calculated  to mislead a  jury in its delibera-
tions, by affording  them a  possible opportunity to accept the

instruction as a complete definition of murder, to the exclusion of any definition before given.   Where a trial court desires to address the attention of the jury to a single phase of of the crime charged, it is generally safer to inform them that if they find, from the evidence, all the ingredients exist as they have been defined, and that the particular condition covered by the matter embraced in the separate instruction also exists, this or that conclusion would follow.   The Supreme Court of California in *People* v. *Evans*, 56 Pac. 1024, have very recently considered a somewhat similar insufficient definition of a phase of murder, and vehemently expressed their disapprobation in much the way this Court did in the Shafer case.   Upon a new trial, however, the danger of such an instruction can be avoided.

8.   Barrett, a witness for defendant, in the course of a severe cross-examination was asked to whom he paid rent. There was no error in this.   Witness seemed to be a roving sort of a character, with no fixed occupation or residence. His evidence was very material, and, to identify him, test his credibility, and sift his statements, it was not improper to pin him down as to his residence, the time he had lived in one place, his occupation, etc.

9.   Defendant argues that the information states no offense. Although it charges murder in the first degree with sufficient certainty to sustain the lower court in overruling a motion in arrest of judgment, it is not as direct or positive in its allegations of the shooting as it might be.   Defendant waived these defects by not objecting to them at the proper time.

10.   We shall not express an opinion at all upon the sufficiency of the evidence to sustain a verdict of murder in the first degree.   The case was a proper one to submit to the jury with instructions upon murder and manslaughter.

It is unnecessary to examine other errors urged by defendant, none of which will probably arise on a new trial.

The judgment is reversed, and the case remanded for a new trial.   *Remittitur* forthwith.

*Reversed and remanded.*

BRANTLY, C. J., and PIGOTT, J., concur.