# THE STATE V. ADAMS.

1. **Criminal Law**: EVIDENCE : CONFLICT : PROVINCE OF JURY.   It is the province of the jury to determine all conflicts in the evidence on a criminal trial, and this rule extends to cases where a witness is in conflict with himself.

2. ————; HOMICIDE : INSTRUCTION AS TO DEGREES OF OFFENSE. Where a homicide had been committed, and there was evidence from which the jury might have found that it was committed by the defendant under such circumstances as to render him guilty of murder, it was for the jury, and not for the court, to determine the degree of the crime, and the court properly instructed as to murder in the first and second degrees and manslaughter.

3. ————: EVIDENCE : IMPEACHMENT : EVIDENCE ON PRELIMINARY EXAMINATION.   The minutes of the evidence given by witnesses on a preliminary examination cannot be used on the trial of the defendant to impeach such witnesses.   (*State v. Hayden*, 45 Iowa, 11, *followed.*)

4. ————: HOMICIDE : PROVOCATION : CHARIVARI : INSTRUCTIONS : PREJUDICIAL ERROR.   Defendant was indicted for murder committed by shooting into a *charivari* party which was creating an uproar with guns, pistols and bells under his window on the night of his marriage.   The court instructed that such conduct did not constitute sufficient provocation in law to reduce the homicide to the grade of manslaughter.   *Held* error, and that the error was prejudicial, even though the defendant was convicted of manslaughter only, because he was entitled to have his case submitted to the jury upon correct instructions on all material points.   (Compare cases cited in opinion.)

*Appeal from Monroe District Court.*—HON. DELL STUART, Judge.

FILED, OCTOBER 4, 1889.

THE defendant was indicted for murder in the first degree.   He was tried, and convicted of manslaughter, and sentenced to imprisonment in the penitentiary for the period of seven years and six months.   He appeals.

*Daniel Anderson* and *T. B. Perry*, for appellant.

*John Y. Stone*, Attorney General, and *Mabry & Morrison*, for appellee.

ROTHROCK, J. — I. Prior to August, 1888, the defendant was an unmarried man, and resided with his aged father and mother upon a farm in Monroe county. It appears from undisputed evidence in the case that he was a peaceable, orderly and law-abiding citizen. A few days prior to the seventeenth day of that month he was married; and, on the night of that day, at about nine o'clock, he arrived with his wife at his father's home. The house was a log structure, one story and a half in height. Within a short time after his arrival, the family retired for the night. The father and mother occupied a bed in the room on the first floor, and the defendant and his newly-married wife slept in a bed near a small window in the upper half story of the house. This window was in the south end of the building. After the family retired there was no light in the house. At about half past twelve o'clock, a party of some fifteen or twenty men and boys of the neighborhood quietly approached the house, and went up to the south side of it, near to the window in the second story. They were armed with revolvers, shotguns and muskets, and some of them carried bells. They opened a sudden fire from the revolvers, guns and muskets, and rang the bells, and shouted and hallooed, so that there was a great noise and disturbance close up to the house. After discharging their firearms, some of them went round to the east side of the house, near where they knew the old people slept, and kept up and continued to make a disturbance. It was soon discovered that one of the party, named Daring, had received a gunshot wound. He was one of the active participants in the affair, and carried and discharged one of the guns. He died from the effect of the wound on the next day. One Miller was the leader of the party. He carried a revolver, and, when he had his command placed in position, he fired the first shot, as a signal for the outbreak of the uproar. He and quite a number of others testified upon the trial that, very soon after the first shot was fired, a succession of from three to five

shots was fired from the window above, near where the defendant's bed was located. The men and boys outside stood south and west of the window. Whether they were all in this position, or not, is not certain. But it appears that the deceased was not directly south of the window when he was wounded. He stood west of south. Some of the parties testified on the preliminary examination that the line of fire from the revolver in the window was south and downward. At the trial they testified that the line was southwest and downward. They acknowledged the discrepancy in their testimony, and made no satisfactory explanation of it. It will be observed that, if the defendant fired from the window south and downward, the deceased could not have been wounded by any shot fired from the window, unless the ball struck some object, and was thereby deflected from a straight line. We do not recite this discrepancy in the testimony of the witnesses for the purpose of entering upon a discussion of the sufficiency of the evidence

1. CRIMINAL law: evidence: conflict: province of jury. to sustain the verdict. It is the province of the jury to determine all conflicts in the evidence, and this rule extends to cases where a witness is in conflict with himself.

The court instructed the jury upon the law pertaining to murder in the first degree, murder in the second

2. ——: homicide: instruction as to degrees of offense. degree, and manslaughter. It is claimed by counsel for the defense that this was erroneous, because there was no evidence authorizing a verdict for any degree of criminal homicide greater than manslaughter. This court never has held that, where a party is indicted for murder, the court should instruct the jury that the defendant cannot be convicted of the crime charged, when it is shown that a homicide was committed by the defendant. Whether such an instruction is authorized in any state of the proof, or in any case, we need not now determine. And here it is necessary to again refer to the testimony of some of the witnesses. Some of the actors in the affair testified that the firing from the window was nearly simultaneous with the firing of the

The State v. Adams.

first shot by the leader of the party. Miller, the leader, testified, upon that subject, as follows: "I don't think it was more than a second after I fired the first shot until I saw the flashes from the window." And there is evidence to the effect that a dog was aroused and barked some time before the first shot was fired. Now, if the jury believed that the defendant fired the shots from the window at the time stated by this witness and others, he must have been awake before they came, and ready with his revolver; and, if he fired in a direct line into the party on the outside, the jury might have found that his crime was murder. At least, the degree of the crime, if any, was not for the court to determine.

II. The defendant was arrested soon after the death of Daring. A preliminary examination was had before a justice of the peace. A short-

3. —: evidence: impeachment: evidence on preliminary examination.

hand reporter was appointed by the justice to take down the minutes of the testimony. Upon the trial, the defendant's counsel called the attention of a number of the witnesses for the state to the minutes of their evidence, and to certain discrepancies between them and their testimony on the trial. Afterwards counsel offered to read the minutes to the jury, for the purpose of impeaching the witnesses. The state objected, and the objection was sustained. Counsel claim that this ruling was erroneous. We think otherwise. This court has expressly determined that question. See *State v. Hayden*, 45 Iowa, 11. The court gave to the defendant the fullest opportunity to call the short-hand reporter, and allow him to use his minutes as memoranda, and thus show what they contained. We think the defendant has no reason to complain of this ruling.

III. We do not understand counsel to claim that the deceased was wounded by one of his comrades. The defense appears to have been based on two grounds: *First*, that the defendant fired his revolver over the heads of the men on the outside; and, *second*, if the deceased was wounded by one of the shots fired from the window it was the merest accident, because the ball

which inflicted the wound struck the limb of a tree, and was deflected from a straight line so that it struck the deceased. All of the outsiders who had guns or pistols testified that they fired them upward. As bearing upon the question as to whether the shooting was accidental, the defendant requested the court to charge the jury as follows: "If the defendant shot out of the window, merely intending to scare those who were shooting below, and to stop the noise and tumult, and did not intend to harm them, but shot out of the window several feet above their heads, and the ball from his revolver, striking a limb about nine feet above the ground, was deflected from its course in such manner as to strike and kill the deceased, this is a case of accidental killing, for which the defendant is not criminally liable. If a man of ordinary prudence, situated as defendant was, surrounded just as he was, might have shot his revolver through and out of the window, not intending to harm any one, and aiming it several feet above their heads, merely for the purpose of frightening the crowd away, in order to stop the noise and tumult by which he was disturbed, it was not culpable negligence in the defendant, if he did the same thing." This request to charge was refused. It is claimed this was error, and that the court did not direct the jury upon this theory of the defense. As we read the abstract, this must be a mistake. In the third request to charge, the jury were fully and fairly instructed upon this feature of the case. The instruction is marked on the margin as given and signed by the judge. There may be a mistake about this instruction having been given. The abstract is in typewriting, and is very much confused. The third request to charge is embodied in the instructions given by the court on its own motion. But as the cause must be reversed upon another ground, we need not pursue this subject further. It is proper to remark, however, that, as this defendant was on trial for his life, it was not the province of the court to disregard his claim as embodied in the above instruction. There was evidence upon that subject proper to be submitted to and considered by the jury.

IV. After instructing the jury quite fully as to the different degrees of criminal homicide, including the provocation necessary to reduce the crime to manslaughter, the instructions proceed as follows: "The fact that one is being annoyed by a *charivari* party would not constitute the provocation referred to herein; that is to say, if the homicidal act of the defendant, if he is guilty of such act, has in it sufficient elements to establish murder in either degree beyond a reasonable doubt, then the mere fact that he was provoked to the act by a *charivari* would not of itself reduce the crime to manslaughter." This instruction, in effect, directs the jury that such a demonstration, made under the window of a dwelling house in the middle of the night, would not be a sufficient provocation to reduce the killing of one of the party to the crime of manslaughter. It is doubtful whether it is the province of the court in any case to direct the jury as to what is, or what is not, sufficient provocation to mitigate the crime to the degree of manslaughter. That question we do not determine. But, as applied to the facts of the case, we cannot approve of the above instruction. The party assembled in the night when the tragic affair took place is called a "*charivari*." Its object is about as barbarous as the pronunciation of its name. Whatever toleration it once had has long since passed away. Even when in vogue it was often attended with violence and bloodshed. If it ever was allowable to direct a jury that such an assemblage, with all its tumult and confusion, was not a great provocation to those annoyed and insulted by it, that time has passed away. Webster says of the custom that "it was at first directed against widows who married a second time, at an advanced age, but is now extended to other occasions of nocturnal annoyance and insult." It is claimed by counsel for the state that this instruction is without prejudice, because the defendant was not convicted of either of the degrees of murder. But it was the right of the defendant to have a fair and impartial trial, and to demand that his case should be

*4. ——: homicide: provocation: charivari: instructions: prejudicial error.*

submitted to the jury upon correct instructions upon all material questions involved. In the case of *State v. Tweedy*, 11 Iowa, 350, the defendant was convicted of manslaughter upon an indictment for murder in the second degree. The cause was reversed by this court, and remanded for a new trial. He was again put upon trial for murder in the second degree, and was convicted of manslaughter. It was held, upon a second appeal, that it was error to put him on trial for murder in the second degree, and this court would not presume that he was not prejudiced thereby. In the case of *State v. Boyle*, 28 Iowa, 522, where the indictment was held to be defective for murder in the first degree, but good for murder in the second degree, and the defendant was convicted of the last-named crime, it was held to be error to instruct the jury that the indictment sufficiently charged the defendant with murder in the first degree. The principle involved in the cited cases appears to us to be the same as that now under consideration. The tendency was to confuse and mislead the jury as to one of the most important questions in the case, and to impress upon their minds that the conduct of the party engaged in the tumult should be lightly considered by them.

A number of other questions are presented in argument, which we will not now consider. The case, being a criminal one, by leave of the court was presented in manuscript, excepting brief printed arguments by counsel. The abstract, as we have said, is very much confused, and we have found it quite difficult to intelligently examine the case. Our conclusion is that the defendant should have a new trial.

REVERSED.