THE CITY OF CHERRYVALE V. MINERVA HAWMAN *et al.*

No. 16,010.

SYLLABUS BY THE COURT.

1. MUNICIPAL CORPORATIONS — *Injury by a Mob — Instruction Defining a Mob.* In an action under the statute making cities liable for injuries done by mobs an instruction that "a mob is an unorganized assemblage of many persons intent on unlawful violence, either to persons or property," is not erroneous because it makes no reference to a determination on the part of those composing the assemblage to resist opposition.

2. ———— *Charivari Party — Unlawful Violence.* Where the members of a charivari party forcibly place a bride and groom in a wagon against their will, and draw them up and down the streets, they are engaged in an act of unlawful violence within the meaning of such definition. The fact that they are good natured and intend no serious harm to any one does not absolve the corporation from liability.

Error from Montgomery district court; THOMAS J. FLANNELLY, judge. Opinion filed May 8, 1909. Affirmed.

*L. P. Brooks,* for the plaintiff in error.

*A. B. Clark,* for the defendants in error.

The opinion of the court was delivered by

MASON, J.: Shortly after a marriage had taken place in the city of Cherryvale a number of men gathered at the house where the bride and groom were staying, placed them in a wagon, and drew them by hand up

and down the streets, making proclamation of their nuptials and introducing them to passers-by in burlesque speeches, attracting a large crowd and occasioning some disorder and tumult. Frank Hawman, nine years of age, was run over by the wagon, his leg being thereby broken. He and his mother each sued the city under the statute making municipalities liable for all damages accruing in consequence of the action of mobs within their corporate limits. (Gen. Stat. 1901, § 2501.) The cases were tried together, the plaintiff recovering in each. The defendant prosecutes error.

The most serious question presented is whether the evidence justified a finding that the gathering constituted a mob within the meaning of the statute. The court instructed the jury that "a mob is an unorganized assemblage of many persons intent on unlawful violence, either to persons or property." This definition, which appears to have originated in Abbott's Law Dictionary, is substantially that usually given by the courts and text-writers. (27 Cyc. 812; 20 A. & E. Encycl. of L. 835; 5 Words & Ph. Jud. Def. 4548.) Its substance was incorporated without objection in the charge in *City of Atchison v. Twine,* 9 Kan. 350. It differs but little from the one asked by the defendant, which reads: "A mob consists of an assemblage of many people acting in a violent manner, defying the law, and committing or threatening to commit depredations upon property or violence to persons." Perhaps, however, this requested instruction suggests an element held in New York to be essential, namely, a determination on the part of the persons composing the assemblage to carry out their purpose notwithstanding any resistance encountered. The statute of that state makes municipalities liable for injuries done by "a mob or riot," and the court of last resort, holding that the two words indicate the same kind of disturbance, excepting as to the numbers taking part, has definitely adopted this definition of the latter:

"A tumultuous disturbance of the peace by three

persons or more assembling of their own authority with an intent mutually to assist one another against any one who shall oppose them in the execution of some enterprise of a private nature and afterward actually executing the same in a violent and turbulent manner, to the terror of the people, whether the act intended were of itself lawful or unlawful." (*Adamson v. City of New York,* 188 N. Y. 255, 258.)

The word "riot" has often been defined, however, without referring either to a purpose to resist opposition or to the inspiring of terror. (24 A. & E. Encycl. of L. 971; 7 Words & Ph. Jud. Def. 6240.) And the statutory definition in New York omits both these elements, reading thus:

"Whenever three or more persons, having assembled for any purpose, disturb the public peace by using force or violence to any other person, or to property, or threaten or attempt to commit such disturbance, or to do an unlawful act by the use of force or violence, accompanied with the power of immediate execution of such threat or attempt, they are guilty of riot." (N. Y. Penal Code, § 449.)

In *Marshall v. City of Buffalo,* 50 N. Y. Supr. Ct., App. Div., 149, it was said:

"This statute [making the city liable for injuries done by a mob or riot] is now substantially the same . . . as the original enactment of 1855. . . . At that time riot was not a statutory crime, and it may, therefore, be presumed that the legislature had the common-law definition in mind." (Page 152.)

In Kansas there is, and was when the law here invoked against the city was enacted, a statute in effect defining a riot, for it provides that "if three or more persons shall assemble together with intent to do any unlawful act with force and violence against the person or property of another, or to do any unlawful act against the peace, . . . the person so offending on conviction thereof shall be fined in the sum not exceeding two hundred dollars." (Gen. Stat. 1901, § 2269.) The next section makes it the duty of any peace officer,

when such an unlawful assembly takes place, "to make proclamation in the hearing of such offenders, commanding them in the name of the state of Kansas to disperse and to depart to their several homes or lawful employments," and if such command is not obeyed to summon aid and enforce it. The Kansas legislature, in passing an act the obvious purpose of which is to make municipal officers more vigilant in suppressing unlawful assemblies, must be deemed to have had in mind the language of its own statute in that regard, rather than any one of the several definitions recognized by the common law. We think the instruction given by the court was sufficient for the purposes of the case.

The question therefore narrows down to this: Was there any evidence of a purpose on the part of those engaged in the demonstration which occasioned the injury to employ force in an unlawful undertaking? There was testimony that several of the ringleaders entered the room where the bride was, and taking hold of her made her go with them; that she, seeing that they were going to use force, said that rather than submit to this she would accompany them, and did so. This was some evidence of the use of unlawful violence. If the purpose of the visitors had been to inflict punishment in revenge for some real or fancied wrong no one would doubt the illegal character of their act. The fact that nothing worse was intended than to subject the victim to embarrassment, annoyance and humiliation in order to provide amusement for the spectators does not change its aspect in the eye of the law. True, the testimony of the bride showed that she cherished no resentment against the perpetrators of the prank, but whether she consented to it at the time was a fair matter under all the evidence for the determination of the jury, and they must be deemed to have found that she did not. They also made a special finding, which was not wholly without support in the evidence, an-

swering in the affirmative the question whether those who caused the injury disturbed the peace of any one on the streets or along the streets over which the wagon was drawn.

There was clearly some evidence that the persons responsible for the injury to the boy constituted a mob, unless they can escape that designation by the plea that they were acting with perfect good nature and intended no real harm to any one. It is hardly necessary to combat that plea with authorities, and yet cases in point are not wanting. In *Bankus v. The State*, 4 Ind. 114, it proved unavailing in a prosecution for a riot, the court saying:

"It is said the rioters were in good humor. Very likely, as they were permitted to carry on their operations without interruption. But with what motive were they performing these good-humored acts? Not, certainly, for the gratification of Wise and his family. They were giving them what is called a charivari, which Webster defines and explains as follows: 'A mock serenade of discordant music, kettles, tin pans, etc., designed to annoy and insult.'" (Page 116.)

In *Gilmore v. Fuller*, 198 Ill. 130, one member of a charivari party was accidentally shot by another. He sought to recover damages, but was denied relief on grounds thus stated:

"The enterprise in which they were both engaged at the time of the injury was an unlawful one. The fact that it is called a 'charivari' does not make it any the less unlawful. The assemblage around the house of Daniel Hirsch in the night-time, there engaged in disturbing a family in which a wedding had occurred, was an unlawful and illegal assemblage, and not only so, but a gathering of illegal trespassers. They were all, including both plaintiff in error and defendant in error, engaged in the same unlawful enterprise." (Page 136.)

In *Higgins v. Minaghan*, 78 Wis. 602, damages were sought against the subject of the charivari for having shot one of its perpetrators. The plaintiff's counsel was permitted in the examination of jurymen as to

their qualifications to ask whether they had any prejudice against that form of amusement.   In expressing its view that such question should not have been allowed the court said:

"Every good, law-abiding citizen must and does condemn such unlawful and riotous assemblies.   They are wholly indefensible in law and morals, and are reprobated by every well-disposed person.   With the same propriety a juror called upon to try a man charged with a criminal act might be asked if he had or entertained any bias or prejudice for or against crime or criminals."   (Page 603.)

In *The State v. Adams*, 78 Iowa, 292, in reversing a conviction of manslaughter, the court used this language:

"The party assembled in the night when the tragic affair took place is called a 'charivari.'   Its object is about as barbarous as the pronunciation of its name. Whatever toleration it once had has long since passed away.   Even when in vogue it was often attended with violence and bloodshed.   If it ever was allowable to direct a jury that such an assemblage, with all its tumult and confusion, was not a great provocation to those annoyed and insulted by it, that time has passed away."   (Page 297.)

Complaint is made of the denial of a motion directed against a defective summons, but as a sufficient summons was afterward issued and served the ruling became immaterial.   Testimony that the mother of the injured boy was a widow was competent in her own case, and therefore the objection made to it is unfounded.   The court struck out a portion of each of several interrogatories to the jury prepared by the defendant, but no material error was thereby committed, for the reason, among others, that the questions as they stood were compound.   An instruction refused with regard to the extent of the injury was sufficiently covered in the general charge.

No error is discovered in the rulings complained of, and the judgment is affirmed.