No. 19,044.

GEORGE BLAKEMAN, *Appellee*, v. THE CITY OF WICHITA, *Appellant.*

### SYLLABUS BY THE COURT.

1. MOB VIOLENCE—*Prisoners in City Jail—Whipping Another Prisoner—Liability of City.* A large number of persons confined together in a city jail who joined together to whip another prisoner, and who did severely whip and injure him, are held to be a mob or riotous assemblage within the meaning of the statute making cities liable for damages resulting from mob violence.

2. SAME. The fact that these persons did not voluntarily come into the jail does not prevent their action from being that of a mob, nor is the primary purpose for which they assembled material if they in fact formed and executed the unlawful purpose after they were brought together.

3. SAME—*Liability of City for Act of Mob.* A city is not relieved from liability for mob violence because its officers were cognizant of the purpose of the mob before the illegal action was taken, nor even where they coöperated with the mob.

Appeal from Sedgwick district court, division No. 2; THORNTON W. SARGENT, judge. Opinion filed December 12, 1914. Affirmed.

*Earl Blake, John W. Blood,* and *R. C. Foulston,* all of Wichita, for the appellant.

*John W. Adams, George W. Adams,* both of Wichita, and *M. C. Freerks,* of Jamestown, N. Dak., for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: This was an action by George Blakeman to recover damages from the city of Wichita for injuries sustained by him while a prisoner in the city jail. It appears that Blakeman became involved in a street fight with a number of boys, with the result that he and a number of the others were arrested and

placed in the city jail. Shortly afterwards the prisoners already in the jail, about thirty in number, organized what is called a "kangaroo court" and proceeded to try Blakeman on the charge of "breaking into their home." He was found guilty of the charge and a fine of fifty cents was imposed upon him. Refusing to pay the fine, he was whipped by the crowd with a strap about three feet long, two and one-half inches wide and about an eighth of an inch thick. In his petition he alleged that the mob assembled in the jail struck him about sixty heavy blows on the back and legs, so that large welts were raised thereon, and that aside from these injuries his back was severely wrenched, with the result that he was incapacitated to perform labor for six months thereafter. It was also alleged that a number of others who were brought into the jail on that day were likewise whipped, and that all was done with the consent and connivance of the chief of police and other officers of the city. It is in evidence that the strap was furnished to the crowd by one of the police officers, and that some of those in charge of the prisoners knew that persons were being whipped with it. Within a few hours after the whipping plaintiff was released from the city prison without prosecution on the charge for which he had been arrested, and it appears that he was confined to his home for four weeks after the whipping and was under the care of a physician for about six weeks after the injury.

While it was alleged that the assault upon the plaintiff was made with the consent of the city officers, the plaintiff states that he is not seeking to establish a common-law liability against the city for the delinquency or misconduct of its officers, but rather that he seeks to recover solely on the liability imposed by the statute which makes cities liable for injuries to persons and property caused by a mob within the corporate limits. (Gen. Stat. 1909, § 2933.) That the plaintiff was

severely whipped while in the prison by the concerted action of quite a number of persons, by which he was seriously injured, is not open to dispute. There was a riotous assembly of persons acting together, bent upon an unlawful purpose, which was executed with force and violence, to the physical injury of the plaintiff. It is contended, however, that the crowd which committed the assault can not be regarded as a mob, and that no recovery can be had under the statute, because the persons who inflicted the injury did not originally assemble for an unlawful purpose, but were brought together in the jail by the officers in a manner provided for by law and because these persons had been guilty of violations of the city ordinances and other laws. Was the crowd which united in an attack on the plaintiff within the walls of the jail a mob within the meaning of the statute? A statute which has been in force since 1868 defines "riotous assembly," a term practically synonymous with "mob," as follows:

"If three or more persons shall assemble together with intent to do any unlawful act with force and violence against the person or property of another, or to do any unlawful act against the peace, or being lawfully assembled, shall agree with each other to do any unlawful act aforesaid, shall make any movement or preparation therefor, the person so offending, on conviction thereof, shall be fined in the sum not exceeding two hundred dollars." (Gen. Stat. 1909, § 2771.)

A later statute, which was enacted in 1903, to suppress and punish mob violence and lynching, provides:

"That any collection of individuals assembled for an unlawful purpose, intending to injure any person by violence, and without authority of law, shall for the purpose of this act be regarded as a 'mob.'" (Gen. Stat. 1909, § 2896.)

In proceedings to recover under the mob statute the term has been properly defined as "an unorganized assemblage of many persons intent on unlawful violence

either to persons or property." (*City of Atchison v. Twine*, 9 Kan. 350; *Cherryvale v. Hawman*, 80 Kan. 170, 101 Pac. 994.)

It appears that the assemblage which inflicted the injury upon the plaintiff has all the elements of a mob unless the fact that the riotous crowd was within the prison when the unlawful purpose was formed and executed is material. No reason is seen why a mob may not be organized and carry out its unlawful purpose inside as well as outside a building or inclosure. The circumstances that the persons did not voluntarily come into the jail and did not originally assemble there to whip the plaintiff does not put them outside the definition of a mob. The manner of their coming together or the primary purpose for which they assembled is not material if they in fact formed the unlawful purpose and became riotous after they were brought together. In *Solomon v. City of Kingston*, 31 N. Y. Supr. Ct. 562 (24 Hun), where a crowd legally assembled to look at a fire and later became riotous and unitedly entered upon the destruction of property, it was held that:

"The fact that the original purpose for which the crowd has assembled, viz., to see the fire, was a lawful one, did not constitute a defense, as they had subsequently united in unlawful conduct and wrongfully broken into the plaintiff's store." (Syl. ¶ 3.)

It has been said that:

"If in an assembly of persons met together on any lawful occasion whatsoever, a sudden proposal should be started . . . or to do any other act of violence, . . . and such motion be agreed to, and executed accordingly, the persons concerned cannot but be rioters, because their associating themselves together for such a new purpose is no way extenuated by their having met at first upon another." (1 Hawkins' Pleas of the Crown, Bk. 1, ch. 28, div. 4, § 3, p. 514.)

*City of Madisonville v. Bishop*, 113 Ky. 106, 67 S. W. 269, 23 Ky. Law Rep. 2363, is a case where a crowd had

gathered to celebrate Christmas and afterwards united in destroying property by throwing fireworks and missiles loaded with powerful explosives, and the court in holding the city liable under a Kentucky statute remarked that:

"The purpose of the assembly, or the aim that it had primarily in view, is not material, if it was in fact riotous or tumultuous, and the city authorities had notice of it and ability to prevent the damage it did." (p. 109.)

In *Commissioners of Champaign Co. v. Church, etc., Admr.*, 62 Ohio St. 318, 57 N. E. 50, 48 L. R. A. 738, 78 Am. St. Rep. 718, the trial court instructed the jury to the effect that if an assembly of persons who inflicted an injury came together without an unlawful purpose and afterwards united in acts of violence and injury no recovery could be had against the municipality. This was held to be erroneous, the court saying:

"It is an ancient doctrine in the criminal law, as old as Hale's Pleas of the Crown, at least, that, although the assembly was lawful, the persons assembled might unite in unlawful conduct and thus become rioters." (p. 348.)

Custody of prisoners within jail limits is hardly consistent with a lack of power and ability to control them, but the fact that the riotous persons were confined within prison bounds does not prevent their action from being that of a mob where all of the other elements are present. The city is vested with the power and charged with the duty of preventing mob violence and preserving the peace everywhere within its corporate limits, and it should be easier to discharge that duty where those who are engaged in the riot are in custody and could be controlled by the officers without much difficulty. It is not a defense to an action brought under this statute to show that the city was unable to prevent the injury (*Iola v. Birnbaum*, 71 Kan. 600, 81 Pac. 198), and certainly it can not hope to escape responsibility where it appears that the city could easily have

prevented the injury. It is not relieved from liability because its officers were cognizant of the purpose of the mob before action was taken, nor even because they became a part of it. One of the purposes of the statute was to quicken the public conscience and stimulate a sentiment in favor of law and order by making each citizen and taxpayer responsible for a proportionate share of the loss resulting from mob violence and thus making each a champion of peace and good order. In *County of Allegheny v. Gibson,* 90 Pa. St. 397, 35 Am. Rep. 670, the law making the municipality liable for mob violence was likened to the ancient English law which made the inhabitants of the respective hundreds responsible for robberies committed therein. It was said that:

"The principle upon which this legislation rested was that every political subdivision of the state should be responsible for the public peace and the preservation of private property; and that this end could be best subserved by making each individual member of the community surety for the good behavior of his neighbor and for that of each stranger temporarily sojourning among them." (p. 418.)

In view of the purpose of the statute and the obligations resting upon municipalities it must be held that neither the delinquencies of the officers nor their misconduct can absolve the city from the obligation to preserve the peace and to prevent mob violence.

There are some criticisms of the rulings of the court on instructions, but those given appear to be in line with the views already expressed, and in none of the rulings do we find any error nor any occasion for extended comment.

The judgment is affirmed.