HIGGINS, Respondent, vs. MINAGHAN, Appellant.

*February 28 — March 18, 1890.*

*Assault: Justification: " Charivari" party: Court and jury.*

In an action to recover damages for a gunshot wound inflicted by the
defendant while trying to frighten away a *charivari* party, it is
*held* that upon the evidence (stated in the opinion) it was error to
withdraw from the jury the question of justification.

APPEAL from the Circuit Court for *Fond du Lac* County.
The facts are stated in the opinion.   The defendant appeals from the judgment entered on the verdict.

*Maurice McKenna,* for the appellant, cited, besides cases
cited in the opinion, 2 Greenl. Evi. sec. 65; 3 id. sec. 95;
*Brown v. Gordon,* 1 Gray, 182; R. S. sec. 4511; *State v.
Snow,* 18 Me. 346; *State v. Dean,* 71 Wis. 678; *State v.
Brown,* 35 Am. Rep. 210; *Comm. v. Runnels,* 10 Mass. 518;
*Comm. v. Porter,* 1 Gray, 480; *Comm. v. Berry,* 5 id. 94;
*Comm. v. Gibney,* 2 Allen, 150; Whart. Cr. Law & Pr. sec.
16; Desty's Cr. Law, secs. 98*e*, 125*d;* 2 Whart. Cr. Law,
sec. 1547; 1 id. secs. 491, 502–4; Whart. Cr. Evi. secs. 69,
70; *U. S. v. Wiltberger,* 3 Wash. C. C. 521; *Selfridge's Case,*
cited in Whart. Homicide, sec. 509; *Maher v. People,* 10
Mich. 212, 221–4.

For the respondent there was a brief by *Duffy &
McCrory,* and oral argument by *J. H. McCrory* and *Chas.
E. Shepard.*

ORTON, J.   This action is brought by the plaintiff to
recover damages for the loss of service of his son John
Higgins, about nineteen years of age, and for expenses of
medical attendance upon him, occasioned by the wounding
of said John in one of his legs by a ball shot from a gun
held and discharged intentionally and maliciously by the
said defendant, on the night of the 25th day of June, 1887.

The plaintiff obtained a verdict of $300. The defendant made a motion to set aside the verdict and for a new trial on the minutes of the court, which was denied.

At the close of the arguments of counsel, the court said, in the presence of the jury: " I am inclined to think, from the testimony in the case given on both sides, that it is the duty of the court, as a matter of law, to charge the jury that no justification has been shown by the defendant, if he perpetrated it, so that the only question for the jury will be," etc. As a part of the instructions to the jury, the court said: " The court has ruled that the facts in this case, if you find that this shot which inflicted this injury was fired by the defendant, he was not justified in doing that act, under the facts and circumstances disclosed by the testimony." The counsel of the defendant duly excepted to said statement and instruction, and also asked the court to give several instructions as to what facts would warrant the jury in finding that the defendant was justified for doing the act charged, which were refused.

We think that, under the peculiar circumstances of this case, the court erred in taking away from the jury the question of justification, and for this error the judgment should be reversed and a new trial ordered. It was the only controverted question in the case, and the only defense the defendant had. The shooting and injury were not denied. The only question left to the jury was as to the amount of the plaintiff's damages for the consequent loss of his son's services. A jury trial might as well have been denied to the defendant, for the loss of services was a mere matter of computation from the testimony. Such a case should be certain beyond all question, and the facts undisputed, to warrant the court in taking it away from the jury. The facts were not undisputed, and the testimony was conflicting and contradictory as to many material facts. The version of what occurred at the time, and of his own con-

duct, given by the defendant and his witnesses, is materially different from that given by the plaintiff's witnesses. The defendant was entitled to the verdict of a jury upon his conduct under the provoking and distressing circumstances of such a great wrong and outrage. As said by the court in *Patten v. People*, 18 Mich. 333, a case of riot by a *charivaring* party, where the outrage was at least no greater, and life was taken: " Of the weight a *jury* should give to these considerations, no safer standard can be given than their own individual consciousness, and the consideration of what they, with the honest purpose of avoiding the danger without unnecessarily taking life, might, under the circumstances in which the defendant was placed, be likely to do." To apply the test sanctioned in the above case the court cannot be as competent as the jury. It is a case peculiarly within the province of a jury.

On what state of facts did the court act in deciding that there was no justification? He had no right to decide whether the evidence of the plaintiff or defendant was most credible. *Kellogg v. Nelson*, 5 Wis. 125; *Mechelke v. Bramer*, 59 Wis. 57; *Bowe v. Rogers*, 50 Wis. 598. The jury would have had the right to believe the defendant's rather than the plaintiff's witnesses. What were the facts, according to the defendant's testimony? The defendant was a respectable farmer and citizen, forty-five years of age, and lived near the village of Chilton. His house was near the highway, and he owned the land on both sides of the road. He had six children living at home,— five daughters, between seven and twenty years of age, and one son, aged eleven years. His first wife had died some two years before, and shortly before the 18th day of June, 1887, he had married a second wife. His children evidently needed a mother's care. On the night of said 18th day of June, about 9 o'clock, a large company of persons, numbering about twenty, congregated in front of his house. He was

about to retire, when some one knocked at his door. He asked who was there. A voice responded, saying: "The boys are out here, and they want $15." He said he would give them nothing, and they had better get out of here. He went out, and the person had gone. He heard a crowd coming, drumming on saws. As they passed his gate, he told them to pass on quietly and make no disturbance. They stopped near his big gate, in front of his barn, and one of them said in a loud voice: "Let's not be driven off. Let us go back and give him hell." Then they commenced shooting with guns, "hollering," drumming on sap pans, singing, and making all the noise possible. They fired off their guns at the same time. They sang: "My wife she died. I married another, the devil's grandmother;" and sang obscene songs. They called him "a son of a bitch" several times, and, after he retreated into the house, they called him that, and to "Come out here." When it got to be between 12 and 1 o'clock in the night they said: "Let us load up with ball and shot, and shoot the damned son of a bitch." Then, as they were going away, they said: "They would have $20 the next night, and they would keep this up all summer." This was after 1 o'clock. The next morning he found his hitching post taken up and placed inside of his fence, and the post-hole full of stones and the sticks used to pound on his fence and gate. On the night of the 22d they came again, with accessions to their number, and there were thirty or forty of them. They repeated the same noises, and fired gun-wads into the gate, and the gate was black with powder, and an obscene cut or picture was made on the gate-post, and they had cut off a long piece of a rope which was in his corn-crib, and left it on the fence. They were shooting and "hollering" that night, like so many devils, firing off their guns, pounding on the fence, calling him to come out, with the same vulgar expressions, and this continued until 12 o'clock. The de-

fendant did not go out that night.   On Saturday night, the 25th, they came there again, about 10 o'clock.   The defendant and his family had gone to bed.   They heard their shouts and guns fired off.   There was no one in the house but the defendant and his wife and children.   He did not get up for a while, or until his wife became agitated by intense fear and was much frightened.   She trembled in bed, and her limbs quivered.   She jumped up and said that he must drive those rascals away or that she would be unable to get up in the morning.   His little girl, seven years of age, was crying in a frenzy of excitement.   She was so affected by fear and excitement that she looked very pale, and would wake up and scream for several weeks afterwards.   This was the situation of things when he got up and went out of the house, and went and borrowed of a neighbor a double-barreled gun, and the neighbor loaded one barrel with shot and one with a ball for him, and when he came back with the gun the rioters were still singing, "hollering," and shooting.   He wanted to frighten them away, and he discharged the shot first towards where he supposed they were, and then waited a while.   They did not go away, and he fired off towards them the other barrel.   Right immediately after he fired that shot he heard a shot fired across the road a little east of where he stood.   He did not shoot until he was satisfied that they intended to shoot at him.   They were loading up for that purpose.   It was evident that they were not going to leave, but to give him battle.   They had hurled a missile against the house, and it struck the jamb of the window.   It was dark.   He could see them only by the flash of their guns.   They were 175 feet away when he shot.   He did not know who they were, but supposed they were actuated by malice.   John Higgins, the son of the plaintiff, who was shot in the leg, was one of the crowd, and armed with a revolver.   They had at least six guns with them.   They appeared to be the

same crowd each night. This is a correct abstract of the defendant's testimony.

In view of this evidence, if the case had been fully submitted to the jury, and they had found that the defendant was justified in shooting as he did, would the court have been warranted in setting that verdict aside for not being supported by the evidence? That is the real question. For if the court would not have been warranted in doing so, then that question should not have been decided by the court, but submitted to the jury. If different persons might reasonably draw different inferences from this evidence, as to whether the defendant was justifiable, then it was a question for the jury and not for the court. On this evidence we think the jury might well have found that the defendant was justified in doing as he did. This may have been called a "*charivari*," but it was to all intents and purposes a riot, participated in by a very large number of desperate and evil-minded persons armed with guns. It was persistent in molesting the defendant's home and family, night after night, and late at night, with increasing disturbance and threats of shooting and personal violence, interspersed with obscenity and ribald songs, in the hearing of the defendant's wife and his five young daughters. They may not have yet committed any personal violence upon the defendant or his family. But the effect of fear and fright might have been as serious and as harmful. The defendant might have reasonably apprehended that, at any moment, they would resort to personal violence, perhaps of the most shocking character. Who can fix limits to the conduct, excesses, and depredations of such a riotous crowd of bad men? How long shall the defendant bear, without resistance, the repetitions of this riot, night after night? What shall he do? He is alone, and unable to cope with such a desperate and armed body of rioters. When may he arm himself and defend his family and his property from

such continued outrages and assault? They had threatened to shoot him. Who can say that his life was not in danger? As a father, he was charged with the protection of that which was dearer than life. What devilish insane idea might strike such a lawless horde of miscreants no one could tell. Such a riot is pregnant with manifold dangers. It must be suppressed either by the constituted authorities or by armed personal resistance. Even a homicide is justifiable when committed by any person while resisting any attempt to commit any felony upon him or upon his dwelling-house, or in the lawful defense of his person or of his wife and children, when there shall be reasonable ground to apprehend a design to do some great personal injury, and there shall be reasonable cause for believing that there is imminent danger of such design being accomplished. Sec. 4366, R. S.

"The defendant was *justifiable* in acting for his defense, according to the circumstances *as they appeared to him.*" *Patten v. People*, 18 Mich. 333. In that case it was a similar riot, and the mother was injured by fright. "Riots are often productive of the most serious crimes, and as it is the duty of a private citizen to interfere for the suppression of riots, so, if a riot can only be apparently suppressed by the taking of life, taking of life, even by a private citizen, will, under such circumstances, be excusable." 1 Whart. Crim. Law, § 499; *Pond v. People*, 8 Mich. 150. "Citizens may, of their own authority, lawfully endeavor to suppress the riot, and for that purpose even *arm themselves;* and whatever is honestly done by them in the execution of that object will be supported and justified by the common law." 2 Whart. Crim. Law, § 1555, and note 1. "It was the defendant's right to have had the question of his justification submitted to the jury." *State v. Adams*, 78 Iowa, 292. That case was also of a similar riot, and life was taken. "When one has used a certain degree of force in order to

protect his property, it is not *matter of law for the court, but matter of fact for the jury*, to decide whether that degree of force was necessary and therefore *justifiable.*" *State v. Clements*, 32 Me. 279. Many other cases of similar import may be found in the very able brief of the defendant's counsel.

This case is of very grave importance, and the law should be well understood in respect to such riotous outrages upon peaceful and unoffending citizens and their families and property at midnight, and as to what they may do in their defense. It is time that such riots, and all riots, should cease within this state. There is nothing more dangerous and menacing to the peace and good order of society and destructive of all private rights. They ought not at least to be encouraged by any fine-spun and hair-splitting theory or dogmatical judgment, made applicable to all cases alike, as to just what the beleaguered and outraged private citizen may not do to defend himself, his family and property, against them. There is no danger whatever that juries will not make, to the peculiar circumstances of each case, an honest and impartial application of the law as given to them by the court, and decide correctly whether the defendant, in such a case, was justifiable in what he did in his own defense. We have not intended to decide, and do not decide, that question in this case as one of law, but I may not have succeeded very well in concealing my own opinion of it. We decide only that the court erred in taking that question from the jury and deciding it as a question of law. I have been greatly aided by the brief and argument of the courteous and able counsel of the appellant, and the learned counsel on both sides very ably tried the case and presented it to this court.

*By the Court.*— The judgment of the circuit court is reversed, and the cause remanded for a new trial.