HIGGINS, Respondent, vs. MINAGHAN, Appellant.

*January 14 — February 3, 1891.*

*Charivari: Assault and battery: Jurors: Prejudice against crime: Instructions: Self-defense: Warning rioters away.*

1. In an action for damages for the shooting of the plaintiff in the leg while he and others were giving the defendant a *charivari,* the plaintiff's attorneys should not have been permitted to ask jurors on the *voir dire* whether they had any prejudice against *charivari* parties.

2. In such a case, instructions as to justifiable homicide were erroneous as being calculated to mislead the jury.

3. The *charivari* party having been warned by the defendant to desist on the first night when they came to his house, and having returned on two subsequent nights, he was not bound to notify them, on the third night, that their shooting, noise, and tumult were terrifying his wife and children and endangering their lives, before taking effectual means, by shooting or otherwise, to drive them away.

4. Upon the question of self-defense, the jury should have been instructed as to the difference between an assault by a body of rioters and one by a single person, and that in the former case the assaulted person may act with more promptness and resort to more forcible means to protect himself and his family than in the latter case.

APPEAL from the Circuit Court for *Sheboygan* County.

Action to recover damages for the shooting of the plaintiff in the leg. The circumstances of the shooting will sufficiently appear from the report of a former appeal in 76 Wis. 298. The defendant appeals from the judgment entered upon a verdict in favor of the plaintiff.

*Maurice McKenna,* attorney, and *L. J. Nash,* of counsel, for the appellant, as to the difference, in respect to the law of self-defense, between an assault by a single individual and one by a mob of rioters, cited *Higgins v. Minaghan,* 76 Wis. 298; *Pond v. People,* 8 Mich. 150, 178; 1 Whart. Crim. Law, sec. 499; 2 id. sec. 1555; Whart. Crim. Pl. & Pr. sec. 16, and note on Philadelphia riots of 1844; Desty, Crim. Law, secs. 98*e,* 125*d; State v. Taylor,* 82 N. C. 554.

Higgins vs. Minaghan.

For the respondent there was a brief by *Duffy &. McCrory*, attorneys, and *Charles E. Shepard*, of counsel, and oral argument by *J. H. McCrory* and *Mr. Shepard*.

COLE, C. J.   We have had occasion heretofore to consider the transactions which gave rise to this action. *Higgins v. Minaghan*, 76 Wis. 298; *Minaghan v. State*, 77 Wis. 643.   It is a matter of regret that the cause was not fairly tried at the last time, so as to stop this expensive litigation, which is ruinous to both parties, however it might finally result.   But we think such error intervened on the trial that there must be a reversal of the judgment.

The first error assigned which we shall notice was the manner of selecting the jury.   On the *voir dire* the plaintiff's counsel was permitted to ask, against the objection of the defendant, whether the juror had any prejudice for or against *charivari* parties, or if he entertained any prejudice against parties that engaged in charivaring.   The learned circuit judge seems to have had some doubt about the propriety of this course of examination, and we think it was wholly wrong.   Every good, law-abiding citizen must and does condemn such unlawful and riotous assemblies.   They are wholly indefensible in law and morals, and are reprobated by every well-disposed person.   With the same propriety a juror called upon to try a man charged with a criminal act might be asked if he had or entertained any bias or prejudice for or against crime or criminals.   Persons are undoubtedly entitled to a fair and impartial jury to try a cause; and where it appears that a juror is prejudiced, of course, upon a knowledge of the facts or that he has bias or prejudice in favor of or against one of the parties, he is disqualified.   But if he has no actual bias and is able to hear the evidence and decide upon it impartially under the guidance of the court as to the law, whatever may be his views as to the enormity of crime in the ab-

stract, he is legally qualified as a juror. Such a juror will try the issues fairly and without prejudice to the substantial rights of either party. The course of the examination as to the competency of the jurors we deem irregular and wrong. It resulted in excluding at least one qualified juror (De Smith) from the panel. We do not understand that a prejudice entertained by a juror against a particular crime constitutes a sufficient ground for excluding him when called to try a person for such offense. See *Williams v. State*, 3 Ga. 453; *Parker v. State*, 34 Ga. 262; *U. S. v. Noelke*, 17 Blatchf. 554, 1 Fed. Rep. 426; *U. S. v. Hanway*, 2 Wall. Jr. 139. It would be almost impossible to obtain a panel in a case if every citizen was excluded from it who had a prejudice against or was opposed to *charivari*, which is in law a crime.

But, while we express our emphatic disapproval of the course pursued in the examination of the jurors on the *voir dire*, we do not reverse the judgment on that ground, but because the cause, we think, was not fairly submitted to the jury by the trial court. A number of instructions were asked on the part of the defendant, some of which were covered by the general charge; and some were refused which should have been given. The instructions and charge are too lengthy to be quoted *verbatim*, nor is it necessary, to make our remarks upon them intelligible. The really controverted question in the case was whether, under the circumstances, the defendant was justified in shooting the plaintiff as he did. The trial court, in considering the question whether the shooting was excusable or justifiable, said:

"The defendant, as he had a lawful right to do, on the 14th day of June married a second wife and took her to his home to live. On the night of June 18, 1887, the plaintiff and others — men and boys — proceeded to the defendant's house, and engaged in what is designated as a *charivari*, the nature and character of which is shown by the evidence.

The same thing was repeated on the nights of the 22d and
25th of the same month. It was continued on the last
night until the plaintiff was shot, when the crowd dispersed.
What was done on each night is for you to ascertain and
consider. The plaintiff was present on the 18th and 25th
of June, as an actual participant, or aiding and encourag-
ing the others, so that he is responsible for the acts, lan-
guage, and conduct of each and every one constituting the
*charivari* party, the same as if done by himself. He knew
what had been done on the night of the 22d, before the
commencement of the proceedings and disturbance on the
25th. The defendant, at these times, was in the peaceable
pursuit of his own business, at home with his family, and
entitled to enjoy domestic peace and tranquility, without
disturbance or molestation from the plaintiff or any one
else. These three gatherings by the plaintiff and others
were composed of men and boys from the defendant's neigh-
borhood, but whether he knew who they were at these
times is, of course, a question for you to determine. The
*charivari* parties consisting of the crowd in front of or upon
the defendant's premises constituted an unlawful assembly;
and by their transactions, conduct, and behavior became
what is known in the law as a 'riot,' tending to the disturb-
ance of the peace and the annoyance, if not the terror, of
the defendant and others in the vicinity; they were tres-
passers in the highway. Where an unlawful assembly and
riot, like the one in question, offers and threatens violence
to persons or property, it may and ought to be repelled
with suitable and necessary force; but, where no violence
is offered or threatened to person or property, no one is
justified in unnecessarily or wantonly killing or wounding
a person engaged in a *charivari*. The law provides a pun-
ishment for such unlawful acts. Persons thus engaged are
not necessarily outlaws beyond the protection of the law,
who may be slain or wounded without cause by any person

not in any actual or apparent danger from their acts. To enable you to determine whether violence was offered, danger to person or property was threatened or contemplated, the numbers in these unlawful assemblies, and their acts and transactions, proceedings, and conduct on the three nights in question may be considered on the question of whether the defendant was justified in doing what he did, if he shot the plaintiff in the leg. . . .

" In case you are satisfied from the evidence that the defendant shot the plaintiff in the leg, your next duty will be to determine whether such shooting was excusable or justifiable. Every one has the right to protect himself and his family from danger to life or limb, and his home from invasion by the felonious acts of others. He may employ suitable and appropriate means and methods to prevent or avoid the threatened danger. Before force can be resorted to there must be real or apparent danger, and an apparent necessity of using force to avoid or prevent an injury. One instance is where one person attempts a battery of another, in which case the latter is not obliged to submit until an officer can be found or a suit commenced, but he may oppose violence to violence, and the limit to this privilege is only this: that he must not employ a degree of force not called for in self-defense; he must not inflict serious injuries in repelling slight injuries, nor take life, unless his life or limb is in danger. Where he exceeds the limit of necessary protection and employs excessive force, he becomes a trespasser himself, and his assailant may recover damages from him for repelling the assault with a violence not called for. As mere words never constitute an assault, neither will they justify the employment of force in protection against them, however gross, obscene, or abusive they may be. There are, probably, exceptions to this general statement, in words grossly insulting to females,— at least, where one would be excused, where grossly vulgar and insulting language was

employed in the presence of his family, if he were promptly to put a stop to it by force. Such force as one may employ in his own defense he may also employ in the defense of his wife, his child, or any member of his family; but to revenge the wrongs of himself or his family is no part of his legal right, and where the danger is repelled, or there is no real or apparent danger, justification for the further use of violence is at an end. The force or means to be employed in self-defense of person or family must be such only as are reasonably necessary to repel or prevent the threatened injury. . . .

" If the noise, disturbance, and disorderly acts of the *charivari* party so affected the wife and children of the defendant that he had reasonable grounds to apprehend that either of them was likely to die or to be seriously injured in body, mind, or health, if such acts were continued, and reasonable cause to believe that such injury might result, then the defendant had the right to use the necessary force to avert the apprehended danger, the same as though an actual attack had been made on their persons;· but if the sole and only danger to be apprehended was the injury to his wife and children from fright or terror, then if the defendant with reasonable safety to himself could have approached near enough to have informed the *charivari* party of this fact, he should have done so, and given them an opportunity to desist, before firing into the crowd; he should have used all reasonable and practicable efforts which he could use without exposing himself to danger to let them know the situation and danger to his family from their acts; but if the acts and conduct of the *charivari* party were of such a character that it would have been impracticable or dangerous to himself or his limb to have gone near enough to have given them this information, then he would be excused from so doing. If alone, and, in addition to danger to his wife and child from fright or terror, there

was imminent danger of a felonious attack on his house or on its inmates or himself, no notice to the *charivari* party of such danger to his wife or child would be necessary; but it would be for you to find whether he is excusable or justifiable in firing, at the time and manner he did, under all the circumstances of the case. The shooting or killing of another is justifiable when committed by any person in either of the following cases."

Now, in respect to this charge, we remark (1) that what is said in it about justifiable homicide was calculated to mislead the jury from the real issue. The defendant did not kill any one, and there was no occasion to define justifiable homicide, for no such question was in the case.

(2) We do not think the defendant was bound to notify the *charivari* party that their shooting, noise, and tumult were causing terror and fright to his wife and children, and were seriously injuring them in mind, body, and health. This was the third night these persons had been engaged in these unlawful and criminal proceedings. On the first night they came the defendant had warned them away, and directed them to desist. The rioters themselves knew, or should have known, that their acts and conduct about the house, in the night, were well calculated to produce terror and fright, and injuriously affect the defendant's family. This was the direct, necessary, and almost inevitable consequence of their acts. If the defendant had again requested them to desist and go away, had told them they were causing serious bodily harm to his wife and children, his notice and warning would probably have been received with derision, insulting remarks, and vile abuse, as they had been on previous occasions. So we think it was error to charge that the defendant was bound to inform the *charivari* party of the fact that their riotous conduct was endangering the life of his wife and children, before taking effectual means, by shooting or otherwise, to drive them away. The circuit

judge evidently held that the defendant had no right to
fire into the body of rioters without notice and without
having commanded them to disperse; but upon the undis-
puted facts of the case the law imposed upon him no such
duty.

(3) We think the charge is faulty because it did not point
out to the jury the essential difference between an assault
by one person and by a body of rioters.   An assault in the
latter case always inspires more terror and is attended with
greater danger than in the former; for, as defendant's coun-
sel says, when a number of men combine to do an unlawful
act a kind of emulation is excited which leads one after an-
other to go to greater and greater excesses and to resort to
more flagrant acts, so that a person assaulted by a mob in
that way is necessarily, from the nature of the case, subject
to greater terror and apprehension than when the assault
is made by an individual, and the assaulted party may act
with more promptness and resort to more forcible means
to protect himself and suppress the riot than in the latter
case.   Here the rioters were firing guns, blowing horns,
drumming on pans, and making all kinds of hideous noises
(76 Wis. 301), and kept up this tumultuous uproar for hours,
until his wife and youngest daughter were nearly frightened
to death.   The defendant could not tell when they would
attack his dwelling-house, or shoot him, or personally assault
him; and in the excitement and confusion the law would
justify or excuse him in the use of fire-arms for the safety
of himself and family, when such means might not be re-
sorted to in the case of an assault by an individual.

This idea, or difference between an assault by one and by
a large number, is embraced in the eleventh and twelfth
and some of the other instructions asked by the defendant,
and the point should have been clearly and emphatically
impressed upon the minds of the jury, for the difference is

Higgins vs. Minaghan.

great, and common experience teaches that the danger to life and property is immeasurably greater in one case than in the other. The trial court should have charged in the language of the eleventh request, or in some equivalent language, that " a riot is regarded in law, always, as a dangerous occurrence, because when rioters have convened in a tumultuous and disorderly manner, and have actually begun to accomplish an unlawful act, to the terror or disturbance of others, the prompting of one rioter is contagion to another, and it is impossible to conjecture or ascertain beforehand to what extremities of lawlessness or crime the excitement and confusion may lead. . . . A private person, who cannot otherwise suppress them or defend himself from them, may justify or excuse the use of firearms or other deadly weapons, because it is both a right and a duty to protect one's self and family, and to aid in preserving the peace."

We see no objection to the charge where the jury were directed: " If a person is assaulted in such a way as to induce in him a reasonable belief of danger of losing his life or of suffering great bodily harm, he will be justified in defending himself, although the danger be not real, only apparent. Such a person will not be held responsible civilly or criminally if he acts in self-defense, from real and honest convictions induced by reasonable evidence, although he may be mistaken as to the extent of the actual danger. A person need not be in actual imminent peril of his life or of great bodily harm before he may shoot his assailant; it is sufficient if in good faith he has reasonable ground from the facts, as they appear to him at the time, to apprehend a design to commit a felony, or to do some great personal injury, and reasonable cause for believing that there is imminent danger of such design being accomplished."

We do not deem it necessary to comment further on the

charge. We think the case was not submitted to the jury upon proper instructions, and that there must be a new trial for that reason.

*By the Court.*— The. judgment of the circuit court is reversed, and a new trial ordered.