STATE, RESPONDENT, *v.* MERK, APPELLANT.

(No. 3,945.)

(Submitted March 10, 1917. Decided April 17, 1917.)

[164 Pac. 655.]

*Criminal Law—Homicide—Self-defense—Evidence—Sufficiency.*

Homicide—Self-defense.
  1. Though society may curtail the right of self-defense and restrain its exercise in many particulars, it is deemed necessary to personal safety and security, and is not incompatible with the public good.
  [As to homicide in self-defense, see note in 26 Am. Dec. 279.]

Same—Justification.

2. Under sections 8301 and 8302, Revised Codes, if the party committing a homicide was the assailant or engaged in mortal combat, he must in good faith have endeavored to decline any further struggle before the killing was done, else he cannot invoke self-defense.

Same.

3. A person assailed may act upon appearances as they present themselves to him, meet force with force, and even slay his assailant, though in fact he is not in actual peril, provided circumstances are such that a reasonable man would be justified in acting as he did.

Same—Justification—Duty to Retreat.

4. A person assailed with apparent murderous intent need not retreat and seek a place of safety before slaying his assailant.

Same—Evidence—Sufficiency.

5. Evidence *held* to show that deceased was the aggressor throughout the difficulty resulting in his death at the hand of accused, so that the latter was justified in shooting deceased.

*Appeal from District Court, Madison County; W. A. Clark, Judge.*

WILLIAM W. MERK was convicted of manslaughter, and from the judgment and order denying his motion for new trial he appeals. Reversed and remanded.

*Messrs. McCaffery & Tyler,* for Appellant, submitted a brief and argued the cause orally.

*Mr. S. C. Ford,* Attorney General, and *Mr. Frank Woody,* Assistant Attorney General, for Respondent, submitted a brief; *Mr. Woody* argued the cause orally.

MR. JUSTICE HOLLOWAY delivered the opinion of the Court.

W. W. Merk was charged with the crime of murder, convicted of manslaughter, and appealed from the judgment and from an order denying his motion for a new trial.

We shall notice but one of the contentions made by the appellant, *viz.,* that the evidence is insufficient to sustain the verdict. There is not any substantial conflict in the evidence. Slight discrepancies as to minor details appear, but these can be accounted for readily without impeaching the integrity of anyone. The defendant is apparently the only living witness

to all the transactions leading up to the tragedy. Each of several other persons was present during a part of the controversy, and it is necessary to piece together these stories to present a composite picture of the whole, independently of the evidence offered by the defendant.

Benjamin Yarbrough, a saloon-keeper at Silver Star, Montana, and a principal witness for the state, testified that about noon of June 2, 1916, James King came into his saloon, and something more than an hour later the defendant and Steve Jovanetti entered the same place; that two or three other persons were present, and all appeared friendly; that card-playing and drinking were indulged in, and after some time Merk and King engaged in conversation with reference to some lambs which King promised to present to Merk's children, and then with reference to some mutton which King claimed he had sent to, or intended for, Merk's family, and which he insisted Merk had received; that Merk denied that he had received the mutton, and King called him a damned liar; that Merk replied in kind, and King remarked that if Merk was not so small, he would slap his face or knock his head off; that Merk then applied to King some vile epithet, and King again remarked that if Merk was not so small, he would hit him; that afterward Jovanetti induced King to go outside, and Merk followed; that when they returned to the saloon King said, "I am all to blame for it," and invited those present to drink with him; that after they had been served, Merk brought up the subject of their previous quarrel, and used some insulting language to King; that King invited Merk to drink and "let it go and say no more about it"; that after taking this drink Merk again referred to their quarrel, and King said to him in effect, "Call me all the vile names you want to and get it off your mind"; that Merk desisted, and the two men then joined the proprietor in drinking; that when Merk again referred to the trouble King remarked that he had done everything to satisfy Merk, and immediately seized Merk by the throat and pushed him against the bar; that Jovanetti attempted to interfere, and King re-

leased Merk and told Jovanetti to stand back or he would give him some of the same treatment; that King again seized Merk by the throat, and they moved to the end of the bar and behind it, breaking some glassware; that he (Yarbrough) interceded, and the men separated and quieted down; that two small boys, Frank Marvin and James Lewis, came to the door, and he then went to a cellar outside the saloon building for some wine, and while he was in the cellar the shooting occurred. Yarbrough had been drinking heavily during the afternoon.

Louis Anderson testified for the state that he was in the saloon for a short time and heard some foul language pass between Merk and King, and that at one time Merk said to King, "Come out and we will settle it," to which King replied, "If you have anything to settle with me, say it right here."

J. H. Barkell was in the saloon for a time early in the afternoon, and heard some of the conversation detailed by Yarbrough.

L. T. Herman heard very little of the conversation, and testified to nothing new.

Frank Marvin, one of the two boys who came to the door of the saloon just before the shooting, testified that when he reached the door of the saloon, King had Merk by the throat, and was asking Merk if he was going to be a man; that King pushed Merk around the end of the bar and behind the bar, breaking the glasses, and on to the cash register; that King slapped Merk's face, released him, and came from behind the bar and said to Merk, "Come on out now and let us be friends," to which Merk replied, "No, I am going to stay here," to which King responded, "Not if I know it," and started around the bar as if to pull Merk out; that Merk then drew a pistol and told King to stand back, and the witness then ran. He heard one shot distinctly, and then several more in such rapid succession that he could not count them.

James Lewis, the other boy, who was thirteen years of age, testified that when he reached the door of the saloon, King was choking Merk and telling Merk to be a man; that he backed

Merk up along the bar and slapped his face. That Jovanetti
attempted to interfere, and King said to him, "Are you in this?
If you are I will be around there in a minute and give you some
of it." That King then threw Merk up against the cash regis-
ter behind the bar and made Merk apologize and say he would
be a man; that King then came from behind the bar and said
to Merk, "Come on out here," to which Merk replied, "No, sir;
I will stay right here," and then King said, "You won't if I
know it," and started around toward Merk; that when King
reached the end of the bar Merk drew a pistol and told King
to stand back; that he did not know what King was then doing
with his right hand; that King stepped back about two steps,
and that Merk then fired the first shot and the witness ran, but
heard other shots, and heard King fall to the floor and heard
groans. The defendant and one of the coroner's jurors testi-
fied that at the inquest held on the day following the shooting,
this boy, James Lewis, testified that he did not know who fired
the first shot.

Otto A. Shultz, King's employer, testified that King usually
carried a revolver when he was on the range or about with stock.
It was also made to appear that each man emptied all the cham-
bers of his revolver; that Merk probably fired five shots and
King six; that three shots from King's revolver entered the
back bar and one shot fired by Merk entered the ceiling of the
building; that Merk received four slight wounds and King re-
ceived three wounds, one of which at least was fatal; that King
fell to the floor almost immediately after the shooting ceased,
and died within a minute or two; that Merk is a small man,
while King was six feet three or four inches tall, raw-boned,
weighed about 210 pounds, and was about forty-five years old.

Jovanetti and the defendant told substantially the same story
as detailed by the witnesses for the state. However, they made
it appear that King employed more vile language, was rougher
in his treatment of Merk, and that he struck Merk two or three
times during the course of the quarrel.

Merk testified that he was choked almost to insensibility; that
he was thrown with great force against the cash register; that he
refused to come from behind the bar because of his fear of King
and to avoid trouble. He denied specifically that he had re-
newed the war of words at any time, or that he invited King
outside to settle their trouble. He testified that he knew that
King habitually carried a revolver, and knew that he had one
on this day; that he had many opportunities to shoot King
while King was choking him, but would not do so and tried to
avoid difficulty; that when King started toward him to bring
him from behind the bar, King said: "You have got a gun; so
have I. Commence shooting"; that both drew their guns at
about the same time; that he did not shoot until he deemed
himself in imminent peril, and that both fired simultaneously
or nearly so. He testified also that he knew that King had been
drinking heavily during the afternoon, and introduced several
witnesses who testified that King was a violent and dangerous
man, particularly while drinking. An equal or greater number
testified to his good reputation for peace and good order. The
defendant himself had been drinking considerably during the
afternoon and before the shooting occurred.

The foregoing fairly epitomizes the material evidence pre-
sented in the record. We have omitted the unspeakably foul
language which the deceased and defendant employed. Appar-
ently each exhausted his very extensive vocabulary of vitupera-
tion and billingsgate.

The right of self-defense has its foundation in the law of
[1] nature. It existed before the formation of society, and
while every individual is presumed to have surrendered to
society the right to punish for crime and for the infractions of
individual rights, the possession and exercise of the right of
self-defense by the individual are still deemed to be necessary
to personal safety and security and not incompatible with the
public good. Society may curtail the right somewhat and re-
strain its exercise in many particulars, but the right itself is
brought by the individual with him when he enters society and

is not derived from it. (13 R. C. L. 810.) The right was recognized by the common law though the rules which regulated its exercise were rigid in the extreme—so rigid, indeed, that they have been greatly liberalized by statutes in most of the states. During the territorial *régime* we had statutes designed to secure to every one the right of self-defense, and while these several statutes modified to some extent the rules of the common law, they in turn were superseded by the Codes whose provisions respecting this subject were far more liberal, and doubtless seemed to be more nearly in harmony with the spirit of the age.

A comparison of our present statutory provisions with the provisions of the Compiled Statutes of 1887 (secs. 32-34, Fourth Div.) will disclose the changes effected by the adoption of the [2] Codes. Section 8301, Revised Codes, provides that homicide is justifiable when committed by any person in the lawful defense of himself, when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury and imminent danger of such design being accomplished. Section 8302 provides that a bare fear of the commission of either of the offenses just mentioned is not sufficient to justify homicide, but the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fear alone. If the party who commits the homicide was the assailant or engaged in mortal combat, he must really and in good faith have endeavored to decline any further struggle before the homicide was committed.

In *State* v. *Rolla,* 21 Mont. 582, 55 Pac. 523, this court said: "If it appeared to the accused at the time of the homicide, as a reasonable person, that it was necessary for him to slay his assailant in order to save his own life or prevent receiving great bodily harm, he had a right to act upon such appearances, and slay his assailant, although he was in no actual danger."

In *State* v. *Houk,* 34 Mont. 418, 87 Pac. 175, we approved an instruction as follows: "It is not necessary, however, to justify the use of a deadly weapon, that the danger be actual. It is

enough that it be an apparent danger; such an appearance as would induce a reasonable person to believe he was in danger of great bodily harm. Upon such appearance a party may act with safety, nor will he be held accountable though it should afterward appear that the indications upon which he acted were wholly fallacious, and that he was in no actual peril. The rule in such case is this: What would a reasonable person—a person of ordinary caution, judgment, and observation—in the position of the defendant, seeing what he saw, knowing what he knew, suppose from this situation and these surroundings? If such reasonable person so placed would have been justified in believing himself in imminent danger, then the defendant would be justified in believing himself in such peril and acting upon such appearances.'' That instruction the court gave in this case. Of course, the defendant might have awaited further assaults by King, and might have taken his chances that they would not result more seriously than the assaults already committed. He might have awaited until he actually received great bodily harm, but if one who is attacked must restrain himself until subsequent events determine whether the attack will result fatally or in grievous bodily harm, then the right of [3] self-defense is one in name only. This is not the law. A person assailed may act upon appearances as they present themselves to him, meet force with force, and even slay his assailant; and, though in fact he was not in any actual peril, yet if the circumstances were such that a reasonable man would be justified in acting as he did, the slayer will be held blameless.

The rule of the common law that, before anyone can be [4] justified in slaying his assailant, he must have retreated to the wall finds no favor with modern courts or text-writers. The defendant was not compelled to seek a place of safety, but in effect he did so. Though it resulted from the brute force of the deceased, the defendant actually found himself behind the bar in a place of comparative safety, and announced his intention to remain there, but was not permitted to do so peaceably. Giving the opprobrious epithets used by the defendant toward

[5]  the deceased all the legal effect possible, still the evidence leaves no doubt that the deceased was the aggressor throughout.

This is not a case where the record presents conflicting stories, and where the verdict may be said to rest upon the finding of the jury in favor of the testimony of some witnesses and against the testimony of others. As we have said before, there is not any substantial conflict in the evidence. That with each succeeding assault made by the deceased his violence increased is apparent from the state's evidence, independently of the testimony of the defendant; that by sheer physical force the deceased was able to inflict great bodily injury is equally apparent; and when to this are added the facts that he was armed with a deadly weapon, that he was, to a greater or less extent, under the influence of liquor and by some of his neighbors at least considered to be a dangerous man when in that condition, and that he drew his gun and emptied all the chambers so nearly directly at the defendant that four shots took effect and three of the six fired were found to have lodged in the back bar near where the defendant was standing; and that all the shots were fired so nearly together that the deceased must have drawn his gun before or at the time defendant fired—all lend color to the testimony of the defendant that he shot only when he deemed himself to be in peril, and convince us that it cannot be said beyond a reasonable doubt that a reasonable man in the position of the defendant, seeing what he saw and knowing what he knew, would not have felt justified in doing what he did.

The judgment and order are reversed and the cause is remanded for a new trial.

*Reversed and remanded.*

MR. CHIEF JUSTICE BRANTLY. and MR. JUSTICE SANNER concur.