STATE OF MONTANA, Plaintiff and Respondent, *v.*
THOMAS PORTER, Defendant and Appellant.

No. 10638.

Submitted December 9, 1963. Decided March 17, 1964.

Rehearing denied May 14, 1964.

391 P.2d 704.

530

DeKalb, Mondale & Johnson, Lewistown, Robert L. Johnson, Lewistown (argued), for appellant.

Peter L. Rapkoch, County Atty., Lewistown (argued), Leonard H. McKinney, Deputy County Atty., Lewistown, Donald Garrity, Asst. Atty. Gen., Helena (argued), Forrest H. Anderson, Atty. Gen., for respondent.

MR. CHIEF JUSTICE JAMES T. HARRISON delivered the Opinion of the Court.

This is an appeal from a judgment of the district court, following a jury verdict finding the defendant guilty of second degree assault, which judgment sentenced the defendant to a term of five years in the state prison. The defendant assigns a number of specifications of error and we shall consider the pertinent facts in connection with our discussion of those specifications.

The defendant, an airman stationed near Lewistown, predicates error upon the introduction by the State of certain testimony concerning his military record. As part of his case for self defense, the defendant called as witnesses his mother and father, who testified that he had a good reputation for peacefulness in his community in Illinois. While the defendant was testifying in his own behalf he stated that he was soon due to get out of the Air Force and that he was to receive an honorable discharge. On cross examination the State elicited from the defendant the fact that he was being discharged from the Air Force before expiration of his normal term of enlistment

because of special courts-martial arising from his partaking of breakfast "out of the chow hall" and his coming to town in fatigues. As a rebuttal witness the State called a Major Mael, the defendant's commander, who testified that the defendant was, in accordance with the major's recommendation, to be separated from the Air Force prematurely because of "unsuitability," characterized by disobedience of orders of his noncommissioned officers. The major further testified that he was unfamiliar with the defendant's character for peacefulness.

On the strength of the foregoing the defendant urges us to reverse his conviction because of prejudicial error. He argues that an honorable discharge is not relevant to the question of his character for peacefulness and thus the State, through cross examination of the defendant and presentation of Major Mael's testimony, improperly attempted to impeach the defendant on a collateral matter. He also advances the contention that the state's cross examination actually did not impeach the defendant's testimony concerning the honorable discharge, but, rather, elicited from him the immaterial fact of his early discharge, for the purpose of vilifying the defendant through Major Mael's testimony. We are unimpressed by either argument.

Respecting the question of whether evidence of the defendant's anticipated honorable discharge is relevant to his character for peacefulness, we have before us a rather unique set of facts. The question as it is usually presented before civilian courts involves the situation where the defendant is no longer in the Armed Forces and, in the face of timely objection, attempts to introduce written or oral evidence of an honorable discharge to bolster his good character. See State v. Sbrilli, 136 N.J.Law 66, 54 A.2d 221 (1947) ; Ridgell v. United States, (Mun.App.Dist.Col.), 54 A.2d 679 (1947) ; Cox v. State, 33 Ala. App. 192, 31 So.2d 378 (1947) ; Ray v. State, 159 Fla. 101, 31 So.2d 156, 172 A.L.R. 726 (1947) ; State v. Stoller, 107 Utah 429, 154 P.2d 649 (1945). In such a situation, most courts hold

that evidence of an honorable discharge is inadmissible on the ground that it is hearsay. State v. Stoller, supra; Ray v. State, supra; State v. Taylor, 293 Mo. 210, 238 S.W. 489 (1922); Stanley v. Whiteville Lumber Co., 184 N.C. 302, 114 S.E. 385 (1922); People v. Eckman, 72 Cal. 582, 14 P. 359 (1887); see also, State v. Spotted Hawk, 22 Mont. 33, 55 P. 1026 (1899), or on the ground that his former character in the Armed Forces is irrelevant to his character in the community where he resided at the time of the alleged crime. State v. Sbrilli, supra; Ridgell v. United States, supra; Cox v. State, supra; cf. Allison v. State, 203 Md. 1, 98 A.2d 273 (1953). In the present case, for reasons to follow, the basis for neither of the above two rationales exists.

█ The evidence of defendant's expected honorable discharge was presented through the testimony of the defendant, which was received without objection. Therefore, we need not inquire into the hearsay problems presented by such evidence. See 5 Wigmore Evidence § 1675a (3rd ed. 1940). Hearsay evidence admitted without objection has probative value, the extent of which depends upon the nature of the hearsay evidence involved and the posture of the case. State v. Keller, 126 Mont. 142, 246 P.2d 817 (1952); Anno. 104 A.L.R. 1130 (1936); 20 Am.Jur., Evidence § 1185 (1939).

█ Thus, the question resolves itself down to whether evidence of an expected honorable discharge is relevant to the defendant's character for peacefulness. In this state a defendant may introduce evidence of his general reputation in the community in which he resides for the qualities relevant to the crime of which he is charged (in this case peacefulness). State v. Popa, 56 Mont. 587, 185 P. 1114 (1919); State v. Jones, 48 Mont. 505, 139 P. 441 (1914); State v. Shadwell, 22 Mont. 559, 57 P. 281 (1899). At the time of the incident leading to the defendant's trial and conviction and for about two years prior thereto, his residence was in a military community. Moreover, the honorable discharge which he anticipated related to

this same period of time. Under these circumstances, we adopt Professor Wigmore's reasoning, which he has set forth as follows:

"A *certificate of honorable discharge* from the United States Army or Navy, assuming it to be admissible by exception to the hearsay rule (post, § 1675a), should be liberally construed, i. e., as importing not merely general good character, or the specific traits mentioned, but any other of the fundamental moral traits that may be relevant in criminal cases. The soldier is in an environment where all weaknesses or excesses have an opportunity to betray themselves. He is carefully observed by his superiors,—more carefully than falls to the lot of any member of the ordinary civil community; and all his delinquencies and merits are recorded systematically from time to time on his 'service record,' which follows him throughout his army career and serves as the basis for the terms of his final discharge. The certificate of discharge, therefore, is virtually a summary of his entire service conduct, both as a man and as a soldier. When it is 'honorable' in its import, it implies a career successfully negativing all of the more common traits involved in criminal charges. In this respect it is therefore more comprehensive than the ordinary community-repute (post, § 1608) to general good character, and is entitled to be used on behalf of an accused on virtually any specific charge of serious crime." 1 Wigmore, Evidence § 59, (3rd ed. 1940). We are reinforced in our conclusion by the fact that the Armed Services, which are certainly familiar with the import of an honorable discharge, take the same view as Professor Wigmore in their courts-martial practice. Para. 135f(2), Manual for Courts Martial, United States, 1951. We emphasize that our present holding, respecting the relevance of the evidence of an honorable discharge, is based upon the fact that we are not presented with an issue concerning the hearsay aspects of such evidence and upon the fact that the defendant was a member of the military community at the time of the

534

incident, which time was to be covered by the anticipated honorable discharge.

██ Because we hold that the evidence of an honorable discharge introduced in the present case is relevant to the defendant's character for peacefulness, it is apparent that evidence adduced by the State, through cross-examination of the defendant or through the testimony of another witness, which impairs the probative effect of the evidence as proof of peacefulness does not constitute impeachment on a collateral matter, nor does it constitute the creation of new and immaterial issues for the purpose of degrading and vilifying the defendant. We believe the evidence introduced by the State concerning the defendant's premature release from the Air Force, and the reasons therefor, logically tends to impeach the defendant's evidence of an expected honorable discharge. Such a discharge, regardless of the character trait with respect to which the issues render it relevant, imports the reasonably unblemished completion of a full tour of duty. If a normal tour of duty is curtailed, regardless of the reason, the probative effect of the honorable discharge is weakened because it encompasses a shorter than normal period during which the individual's character is subject to observation and evaluation. The fact that the cause of the instant defendant's expected early discharge, i. e., disobedience of orders of his non-commissioned officers, tends to degrade him to some degree does not render evidence of such cause inadmissible; even evidence of past serious crimes is admissible if it is logically relevant to some issue other than merely a defendant's predilection to commit crime. State v. Merritt, 138 Mont. 546, 357 P.2d 683 (1960). In this case the defendant's non-military behavior is relevant as explaining the reason for his early discharge.

██ The defendant, in support of his argument that he was prejudiced by the State's impeachment of his evidence of the forthcoming honorable discharge, asserts that such evidence was not introduced for the purpose of bolstering his character

for peacefulness. This argument misses the mark, for a party obviously cannot produce evidence tending to prove a fact in his favor and escape the consequences of impeachment on the ground that the evidence was actually produced for another purpose. Such a rule would deprive the triers of fact of both sides of the story.

The defendant also assigns as error the failure of the lower court to give certain requested instructions. Since a party is entitled to complete instructions on his theory of the case, provided there is any evidence fairly tending to support it, State v. Reagin, 64 Mont. 481, 210 P. 86 (1922), we will commence our discussion of the alleged instructional errors with a consideration of the evidence introduced on behalf of the defendant; in the interest of completeness we shall then briefly consider the State's evidence. The defendant testified at length in his own behalf and we shall first consider his version of the transaction leading to his trial and conviction.

About 9:30 P.M., December 15, 1962, the defendant and his girl friend were parked on a side road near Lewistown, Montana. A car containing three men stopped beside the defendant's car and one of the men, to the amusement of the others, asked the defendant "if he was getting any"; the men made other insulting remarks in the same vein and soon drove off. The second car returned shortly and one of the men said: "well, we ought to take over," to which the defendant replied: "why don't you wait and meet me in town * * * at least the odds are better." According to the defendant: "I figured I would delay them enough to get out of there. If I got into town, I could lose them." Soon thereafter the defendant drove into town at a high rate of speed with the second car following closely behind. During the short drive into Lewistown, the second car attempted several times to pull alongside the defendant, which maneuver the defendant construed as an effort to run him off the road. He forestalled these attempts by

manipulating his car back and forth between the right and left driving lanes.

When his car arrived in Lewistown the defendant was forced to stop because of a red light which had halted another car ahead of him. The car containing the three men stopped behind the defendant's car. The defendant then "figured it would be a good time to go out and find out what they were trying to do." He was wearing a pair of gloves and had in his possession a hunting knife which he concealed in his left glove to equalize the odds if an altercation should flare up. He walked back to the driver's side of his antagonists' car and asked the driver "what he was trying to prove up there." One of the other occupants of the car then emerged from the other side and attacked the defendant with his fists. The defendant retaliated by stabbing his assailant twice with the knife, inflicting two severe, though not fatal, wounds.

The defendant's testimony was controverted in a number of important respects by the State's witnesses, who included the three men in the second car involved in the above-described events. The State's evidence tended to show that while the participants were at the place of initial encounter outside of Lewistown, and after the insulting remarks by the three men in the second car, the defendant emerged from his car and said he would take on one or all of them. He also stated that he would meet them at a Lewistown establishment known as the "Snow White." During the drive into Lewistown, according to the State's witnesses, they attempted to pass the defendant, rather than run him off the road, and their attempts were frustrated by the defendant's manipulation with his car, as described above. They also testified that it was their desire to avoid any physical conflict with the defendant and any companions he might enlist to his cause. They followed the defendant merely because one of their number wished to go home and the route to his house was the same route being pursued by the defendant. This route likewise passed the "Snow

White" and when the defendant reached said establishment he stopped his car and stated "this is it, fellows," or words to that effect. Thereupon, stated the victim of the assault: "I got out and walked around to the front of my car with the intention of fighting him, and he made a move at me and I made a move to protect myself and that's when he stabbed me in the chest." The witness further testified that he attempted to get away from the defendant by backing across the street and that the defendant pursued and overtook him, inflicting the second knife wound.

The defendant's girl friend testified that on the way into town defendant requested her to get his leather buckskin gloves from the jockey box. That she did so and at that time there was a hunting knife in the jockey box which defendant secured. He put the gloves on and placed the knife in the glove on his left hand.

On the basis of his version of the facts, as outlined above, the defendant requested the following instruction:

"You are instructed that any use of force or violence, disturbing the public peace, or any threats to use force or violence, if accompanied by immediate power of execution, by two or more persons acting together, and without authority of law, is a riot. If in your deliberations you conclude that the behavior of Bud Dengel, Wayne Pallett and Bob Parry was riotous then you should consider that a riot is regarded in law, always, as a dangerous occurrence, because, when rioters have convened in a tumultuous and disorderly manner, and have actually begun to accomplish an unlawful act, to the terror or disturbance of others, the prompting of one rioter is contagion to another, and it is impossible to conjecture or ascertain beforehand to what extremities of lawlessness or crime the excitement and confusion may lead. A private person, who cannot otherwise suppress them or defend himself from them, may justify or excuse the use of deadly weapons, because it is both

538

a right and duty to protect one's self and those dependent upon one's care."

 Under certain circumstances, such an instruction, with some modification, might be appropriate. As stated in State v. Daw, 99 Mont. 232, 239, 43 P.2d 240 (1935) : "If the evidence discloses a tumultuous trespass by three or more persons seeking to commit an unlawful act, those constituting the assemblage may be termed 'rioters' * * * and, in connection with the instructions on the right of self-defense, the court should point out to the jury the essential difference between an assault by such a body of men, and that by an individual." In the present case it is so obvious the defendant was not assaulted by an assemblage of rioters that there is no point in belaboring this opinion by any further consideration of that instruction. (See Higgins v. Minaghan, 78 Wis. 602, 47 N.W. 941, 11 L.R.A. 138 (1891), for an example of a situation where such an instruction might be warranted.) "[A] party cannot suggest an imaginary state of facts, and then demand that the court instruct the jury as to the law applicable to such imaginings." State v. Reagin, supra.

The defendant also proposed the following three instructions, which were not given:

"You are instructed that the number of persons making an assault is a factor to be considered in determining whether a defendant used undue and unnecessary violence in resisting the assault."

"You are instructed that to justify use of a deadly weapon in defense of the person, it is not necessary that the assailant have or appear to have a weapon in his hands, since a disparity in ages and physical strength and condition may be such as to induce a reasonable belief by defendant that he is in danger of great bodily harm."

"You are instructed that if a man reasonably believes that he is in immediate danger of great bodily harm from his assailant, he may stand his ground, and that, even should he slay his

assailant, he has not exceeded the bounds of lawful self defense."

The first instruction quoted above was properly refused because the evidence does not, even when viewed in the light most favorable to the defendant, support the supposition that a number of persons were assaulting him when he inflicted the knife wounds upon his victim. There is likewise no error in failing to give the above-quoted second or third proposed instructions, because the principles contained therein were adequately disclosed to the jury in the following instruction, which was given:

"You are instructed that a person assailed may act upon appearances as they present themselves to him, meet force with force, and even slay his assailant; and, though in fact he was not in any actual peril, yet if the circumstances were such that a reasonable man would be justified in acting as he did, he will be held blameless.

"It is not necessary to justify the use of a deadly weapon, that the danger be actual. It is enough that it be an apparent danger; such an appearance as would induce a reasonable person to believe he was in danger of great bodily harm * * *."

This instruction gave the defendant ample opportunity to expound to the jury his theory concerning the legal effect of the disparity in age, strength and physical condition between the defendant and his victim. Moreover, the cases cited by the defendant in support of his contention that the third proposed instruction quoted above should have been given announce a principle which is specifically covered by the above-quoted instruction which was given. State v. Totten, 65 Mont. 203, 210 P. 1061 (1922); State v. Merk, 53 Mont. 454, 164 P. 655 (1917).

The defendant also takes issue with the refusal of the lower court to give the following proposed instruction:

"You are instructed that the law accords to an individual the right to keep and bear arms and to use the same in

defense of his person, his home or his property." While that is a correct statement of the law, the refusal to give the instruction was not error, because it is immaterial to any issue of the case. The question before the jury was whether the use of the knife under the circumstances was legally justified, not whether his initial possession of the knife was legal.

The remaining specification of error assigned by the defendant is based upon the lower court's sentencing procedure following the jury's verdict of guilty. On the day after the verdict the lower court entered judgment, sentencing the defendant to imprisonment in the state prison for five years. On the same day, the judgment was vacated for the reason that its rendition was not prolonged for forty-eight hours following the verdict, as required by section 94-7801, R.C.M.1947. The record also demonstrates that the judgment was pronounced in the absence of the defendant, in disregard of section 94-7803, R.C.M.1947. On the fourth day after vacation of the first judgment, the lower court, in the presence of the defendant and his attorney, again rendered judgment, imposing the same sentence as the earlier judgment.

The defendant contends that the rendition of the first judgment in his absence, and before two days had elapsed following the verdict, was prejudicial error. He also argues that the order of the lower court vacating the judgment, and the pronouncement of the subsequent judgment, which was rendered in compliance with the applicable statutes, did not cure the error. The latter assertion is based upon the proposition that the first judgment was valid, though erroneous and voidable, and that the lower court was therefore lacking in jurisdiction to unilaterally vacate said judgment.

This State is committed to the doctrine that once a valid sentence has been pronounced, the court imposing the same is lacking in jurisdiction to vacate or modify the sentence, except as otherwise provided by statute, as in the case of a motion for a new trial. State ex rel. Reid v. District

Court, etc., 68 Mont. 309, 218 P. 558 (1923); State v. Fowler, 59 Mont. 346, 196 P. 992, 197 P. 847 (1921). (It is noted parenthetically that the underlying rationale behind the practice of allowing a post sentence withdrawal of a guilty plea, when appropriate, is that a sentence based upon an involuntary plea of guilty is invalid. State ex rel. Foot v. Dist. Ct., etc., 81 Mont. 495, 263 P. 979 (1928)). The defendant's contention that a sentence may be erroneous or irregular and still be valid, for the purpose of determining whether the lower court has jurisdiction to modify or vacate the same, is correct. See Anno. 168 A.L.R. 706 (1947). However, we disagree with his assertion that the sole test of validity of the sentence is whether the court had jurisdiction over the defendant and the crime and power to fix the punishment assessed. See 168 A.L.R. 706, supra, at 720. When a sentence is pronounced under circumstances manifesting a disregard of procedures designed to safeguard the rights of a defendant, as was the first sentence in the present case, we are of the opinion that such a sentence is null and void and not merely erroneous and voidable. (See People v. Dalton, 205 Misc. 755, 130 N.Y.S.2d 222 (1954), holding that failure to observe the two-day waiting period is merely a procedural irregularity, while failure to ask a defendant if there is legal cause why judgment should not be pronounced against him (which is less prejudicial in quality than imposition of sentence in the defendant's absence) renders the sentence null and void.) Therefore, we hold that a court which pronounces sentence upon a defendant in his absence, in disregard of section 94-7803, R.C.M.1947, may, on its own motion, vacate the same and subsequently pronounce a sentence in compliance with the requirements of that statute. Powell v. Commonwealth, 182 Va. 327, 28 S.E.2d 687 (1944); McCormick v. State, 71 Neb. 505, 99 N.W. 237 (1904).

The judgment is affirmed.

MR. JUSTICES CASTLES, JOHN CONWAY HARRISON and DOYLE concur.

542

MR. JUSTICE ADAIR dissenting:

As his first specification of error on this appeal, the defendant, Thomas Porter, assigned the admission in evidence of the testimony of the State's concluding witness, Major Francis B. Mael, Commander of the 694th Radar Squadron, Lewistown Air Force Base, Lewistown, Montana, and the placing in evidence by him of what he called his "derogatory file," and his testimony of his estimate of the character of Airman Thomas Porter, and of two alleged military court martial proceedings, all of which were and are most damaging if not deadly, and all of which were wholly inadmissible.

Major Mael was a surprise witness. His name had not been endorsed on the information on which Thomas Porter was tried, and in my opinion the trial court committed reversible error in the overruling and denial of the numerous objections made by defendant Porter's counsel to such procedure and the admission of the contents of the Major's "derogatory file," and of his oral testimony relative to the alleged court martial proceedings.

In my opinion, the defendant, Thomas Porter, has been denied the fair trial to which he was entitled under the law and the judgment should be reversed and the cause returned to the District Court for a new trial.